MOTOR CARRIERS TRAFFIC ASSOCI-ATION, INC., Petitioner,

v.

The UNITED STATES of America and the Interstate Commerce Commission, Respondents,

and

Drug & Toilet Preparation Traffic Confer-ence, Eastern Industrial Traffic League, National Small Shipments Traffic Con-ference, National Industrial Traffic League, Intervening Respondents.

ROCKY MOUNTAIN MOTOR TARIFF BUREAU, INC., Petitioners,

v.

The UNITED STATES of America and the Interstate Commerce Commission, Respondents,

and

Drug & Toilet Preparation Traffic Confer-ence, Eastern Industrial Traffic League, National Small Shipments Traffic Con-ference, National Industrial Traffic League, Intervening Respondents,

and

Bulk Carrier Conference, Inc., Intervening Respondent.

ALL ISLAND DELIVERY SERVICE, INC., Feuer Transportation, Inc., John A. Jungerman Son, Inc., Pinter Bros., Inc., Troiano Express Co., Inc., Petitioners,

v.

The UNITED STATES of America and the Interstate Commerce Commission, Respondents,

and

Drug & Toilet Preparation Traffic Confer-ence, Eastern Industrial Traffic League, National Small Shipments Traffic Con-ference, National Industrial Traffic League, Intervening Respondents.

Nos. 76–1329, 76–1425 and 76–1426.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 7, 1976.

Decided July 21, 1977.

J. Raymond Clark, Washington, D. C. and A. W. Flynn, Jr., York, Boyd & Flynn, Greensboro, N. C., for petitioner in No. 76–1329.

Bryce Rea, Jr., Washington, D. C., Counsel for petitioners in No. 76–1426.

Donald I. Baker, Asst. Atty. Gen., Lloyd John Osborn, Dept. of Justice, Washington, D. C., for the United States of America, respondent.

Robert S. Burk, Acting Gen. Counsel, and Hanford O'Hara, Associate Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for the Interstate Commerce Commission, respondents in Nos. 76–1329, 76–1425 and 76–1426.

John F. Donelan, John M. Cleary and Frederic L. Wood, Washington, D. C., for the National Industrial Traffic League, intervening respondent in Nos. 76–1329, 76–1425 and 76–1426.

Daniel J. Sweeney, Belnap, McCarthy, Spencer, Sweeney & Harkaway, Washington, D. C., for intervenor, Drug and Toilet Preparation Traffic Conference, Eastern Industrial Traffic League and National Small Shipments Traffic Conference, in Nos. 76–1329, 76–1425 and 76–1426.

William E. Kenworthy, Denver, Colo., and Bryce Rea, Jr., Washington, D. C., for petitioner Rocky Mountain Motor Tariff Bureau, Inc. in No. 76–1425.

Leonard A. Jaskiewicz and Edward J. Kiley, Washington, D. C., for intervenor Bulk Carrier Conference, Inc. in No. 76–1425.

Before CLARK, Associate Justice *, BUTZNER and WIDENER, Circuit Judges.

* Tom C. Clark, Associate Justice of the United States Supreme Court (Ret.), sitting by designation.

Mr. Justice CLARK:

These three consolidated appeals from the Interstate Commerce Commission seek to set aside, in part, Orders that were entered by the Commission in Ex Parte No. 297, *Rate Bureau Investigation*, which was a broad scale study of the regulated transportation industry's various collective rate-making organizations, known as "rate bureaus".

The history of collective rate-making efforts by surface transportation carriers in the United States is both long and controversial. See: *United States v. Trans-Missouri Freight Assn.*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); *United States v. Joint Traffic Association*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898); *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *Western Traffic Assn.—Agreement*, 276 I.C.C. 183 (1949). The Congressional action took the form of the Reed-Bulwinkle Act of 1948, 62 Stat. 472, Section 5a of the Interstate Commerce Act (49 U.S.C. § 5b). Congress decided that the problem was one of reconciling the demands of the Nation's transportation system with the policies of the antitrust laws. This Act left "the antitrust laws to apply with full force and effect to carriers . . except as to such joint agreements or arrangements between them as may have been submitted to the Interstate Commerce Commission and approved by that body upon a finding that, by reason of furtherance of the national transportation policy as declared in the Interstate Commerce Act, relief from the antitrust laws should be granted." H.R.Rep.No.1100, 80th Cong., 1st Sess., at 5, U.S.Code Cong.Serv.1948, pp. 1844, 1848. Surface carriers that are parties to agreements concerning rates and related matters can submit such agreements to the Commission for approval and, if approved, the parties to the agreements are relieved from the operation of the anti-

trust laws with regard to the same. 49 U.S.C. § 5b(2). The Act mandates the Commission to approve the agreement only if it finds that the agreement is in furtherance of the national transportation policy and is not prohibited by 49 U.S.C. §§ 5b(4), (5), and (6).[1] The Commission, in carrying out this directive of Congress is the creator of the rate bureau since without immunity from the antitrust laws, it cannot operate. Indeed, the Act requires that rate bureaus operating under approved agreements must maintain and keep open for inspection accounts and records and to file such reports as the Commission requires. 49 U.S.C. § 5b(3). The Commission is also given authority to investigate and determine whether any previously approved agreement, or any terms or conditions upon which the approval was granted, are in conformity with the standards of 49 U.S.C. § 5b(2), and further, the Commission is given the power to terminate or modify its prior approval in order to insure compliance with the standards of the Act. 49 U.S.C. § 5b(7).

Pursuant to 49 U.S.C. § 5b, the Commission has from time to time approved rate bureau agreements. See, e.g., *Western Traffic Assn.—Agreement, supra; Rocky Mountain Carriers—Agreement*, 302 I.C.C. 569 (1958); *Motor Carriers Traffic Assn., Inc.—Agreement*, 301 I.C.C. 781 (1957); *Eastern Tank Carriers—Agreement*, 301 I.C.C. 359 (1957); *Middle Atlantic Conference—Agreement*, 283 I.C.C. 683 (1951).

It was to review its approval of such prior Agreements that Ex Parte No. 297 was instituted in 1973, posing twenty-eight areas of inquiry, as specifically authorized by 49 U.S.C. § 5b(7). Numerous parties indicated an intention to participate in the proceedings; consequently, by Order dated November 15, 1973, the Commission directed the Bureau of Enforcement "to file and

---

1. 49 U.S.C. §§ 5b(4), (5), and (6) prohibit approval of agreements which:

(1) are among carriers of different specified classes and are not limited to matters relating to transportation under joint rates or over through routes;

(2) which involve "pooling" under § 5(1) of the Act (49 U.S.C. § 5(1)); or

(3) which do not accord to each party the "free and unrestrained right to take independent action either before or after any determination arrived at through such procedure."

serve a statement of verified facts and of argument setting forth the matters developed in the field investigations, as well as from other sources, regarding the conduct of the carrier rate bureau as a catalyst for the subsequent submission of initial statements of facts, arguments and opinion by the respondents and other interested parties." *First Report*, 349 I.C.C. at 816. Several hundred initial and reply statements were filed in response. The Orders of the Commission arising out of this survey directed that the agreements of rate bureaus would not thereafter be accorded antitrust immunity under 49 U.S.C. § 5b; (1) if such bureaus protest the independent action proposals of any of their member carriers; (2) if such carrier members are affiliated with shippers, unless the agreements of the bureau prohibit such carriers from serving on the bureau's Board of Directors, general rate committees or any other committees which have an effect directly or indirectly upon the rate-making function of the bureau, without prior Commission approval; and, finally, (3) if the bureaus involved are operating as profit-making entities.

The petitioners include Motor Carrier Traffic Association, Inc. (MCTA), a motor carrier rate bureau operating for profit, which challenges the withdrawal of antitrust immunity from bureaus which operate for profit; Rocky Mountain Motor Traffic Bureau, Inc. (Rocky Mount), a motor carrier rate bureau challenging the restrictions on carrier members of bureaus affiliated with shippers; and All Island Delivery Service, Inc., Pinter Bros., Inc., Troiano Express Co., Inc., Feuer Transportation, Inc., and John A. Jungerman Son, Inc., individual carrier members of the Middle Atlantic Conference, a rate bureau, challenging the provisions of Ex Parte 297 which withdraw antitrust immunity from rate bureaus protesting independent action proposals of member carriers before the Commission. Additionally, several organizations interested in the outcome have intervened. Respondents are the Interstate Commerce Commission and the United States (statutory respondent under 28 U.S.C. § 2344). This court's jurisdiction to review lies under 28 U.S.C. §§ 2321 and 2341 *et seq.*

The questions raised by the petitioners range from First Amendment rights to a charge of "arbitrary and capricious conduct" on the part of the Commission. None of the claims are meritorious, as we will briefly show below. In so finding, we uphold the Orders of the Commission.

■ 1. At the outset we note that Section 5a(2) of the Act (49 U.S.C. § 5b(2)) authorizes the Commission to approve an agreement made under the provisions of the Section "if it finds that, by reason of furtherance of the national transportation policy declared in this Act, the relief provided in paragraph (9) . . . should apply with respect to the making and carrying out of such agreement; otherwise the application shall be denied." The Commission followed this procedure and, in approving the applications, provided that they were subject to "such [general] terms and conditions as the Commission may prescribe". In addition we note that Section 5a(7) of the Act (49 U.S.C. § 5b(7)) specifically authorizes the Commission "to investigate and determine whether any agreement previously approved by it under this section . . . is not or are not in conformity with the standards set forth in paragraph [5a(2), 49 U.S.C. § 5b(2)]"—in "furtherance of the national transportation policy." In addition, Section 5a(7) provides:

. . . after such investigation, the Commission shall by order terminate or modify its approval of such an agreement if it finds such action necessary to insure conformity with such standard, and shall modify the terms and conditions upon which such approval was granted to the extent it finds necessary to insure conformity with such standard . . .

Despite these clear and unequivocal words, petitioners say that under the First Amendment and Section 216 of the Act, 49 U.S.C. § 316, the rate bureaus have a constitutional right to file such protests. Section 216(e) of the Act, 49 U.S.C. § 316(e), does provide that "Any person, State board, organization, or body politic may make com-

plaint in writing to the Commission that any such rate, fare, charge, classification, rule, regulation, or practice, in effect or proposed to be put into effect, is or will be in violation of this Section or of Section 217 (49 U.S.C. § 317). . . ." It may be that under Section 216 or 217 individual protests may be filed but, strangely enough, only Section 5a deals with "agreements concerning rates and related matters", and it requires prior approval of the Commission in order for the parties to the agreements to escape the penalties of the antitrust laws. To permit a rate bureau to protest the proposals of a member individually so chills the individual proposal that it stands little chance of adoption, while providing the opportunity for misuse of the bureaus as policing agencies against individual action. We agree with the Commission that "it is necessary to limit the bureaus' right to protest in order to foster independent action. The right of independent action is paramount to maintaining the integrity of the grant of antitrust immunity." The interpretation pressed by the petitioners would operate to repeal Section 5a, the very heart of the Act, leaving the bureaus without statutory authorization as well as antitrust immunity.

Petitioners urge that the Commission cannot reverse itself and now impose restrictions on the bureaus and that such action is arbitrary and capricious. The short answer is, of course, that reversal of views is no anomaly in democratic societies. In fact, it is the principal tool by which improvement is effected. The Supreme Court itself not only engages in the practice but has approved of its use by the Commission. See: *American Trucking Assns., Inc. v. Atchison T. & S.F. Ry. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). Further, there is nothing irrational about the new rule that the Commission intends to put into effect. In fact, the new rule is in the true tradition of our free enterprise system which has been the keystone of our economic accomplishment for nearly a century. The Commission, in so acting, exercises its legislative function, and, as the Fifth Circuit has said: "may look beyond

[the record] and draw upon its own expertise and experience." *General Telephone Co. v. United States*, 449 F.2d 846, 862 (1971). Based upon its experience, the Commission found that, as usual, more goes on than meets the eye. The paucity of formal bureau protests does not adequately reflect the number of threatened protests, nor has the mere existence of the right to protest had a significant anti-competitive impact, both Commission findings. Certainly the purpose of the Commission was to stimulate competition by removing the inhibitions against the filing of independent actions, a move not only in the spirit of Section 5a of the Act but in furtherance of the national transportation policy which is the essence of this case.

■ 2. We now reach the challenge to the order prohibiting carriers that are in any way affiliated with a shipper from serving on a bureau's board of directors, general rate committee or any other committee which has an effect, either directly or indirectly, upon the rate-making function of the bureau, without specific prior Commission approval. It is said that this requirement is beyond the Commission's statutory authority and is also arbitrary and capricious. As we have already indicated, Section 5a(7) of the Act, 49 U.S.C. § 5b(7), grants the Commission full and complete authority to act as it did, and we shall not discuss the point further. See: *United States v. Chesapeake & Ohio Ry. Co.*, 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (decided June 17, 1976); *United States v. Allegheny-Ludlum Steel*, 406 U.S. 742, 755, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). Nor does the Commission's Order violate a legislative policy favoring rate bureau organizations. The Order does not destroy the basic purpose of the bureaus, contrary to the bureaus' claim, as the restrictions are not absolute—the Order itself permits exceptions. Moreover, we note that the Congress directed that the Commission should weigh the conflicting demands of the antitrust laws and the surface transportation system, resolving the same by the application of a standard involving the National Transpor-

tation Policy. H.R.Rep.No.1100, 80th Cong. 1st Sess: at 5, U.S.Code Cong.Serv.1948, p. 1844. Such a resolution requires consideration, not only of efficiency but of competitive impact. See: *McLean Trucking Co. v. United States*, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

Nor do we believe that the action of the Commission in this regard lacked a rational basis. Our study of the problem shows that the possibility of a conflict of interest is self-evident, although none was actually shown. In such a state of the record, it appears rational for the Commission to prohibit shipper-affiliated carrier participation in those activities where the possibility of a conflict of interest is high, but to permit exemptions through Commission approval of bureau applications. The Commission adopted a stance which in effect, is a case by case disposition, rather than a general rule. We find that this procedure overcomes the petitioners' objection.

The remaining contentions regarding this rule are frivolous and require no discussion.

■ 3. The final issue presented is the question of rate bureau profit-making activities. It is contended that prohibiting profit-making is beyond the power of the Commission and that the action involved here should be classified as adjudication, rather than rule-making. As we have indicated, *supra*, we consider the action of the Commission in Ex Parte 297 to constitute rule making—and, we add, all of the petitioners, save one, agree. Under the Administrative Procedure Act " 'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4). Petitioner points to no applicable provision of law which requires a full-dress hearing here, nor have we found any.

■ The petitioner finally claims that the Commission has no power to prohibit profit-making and to do so is an unconstitutional deprivation of property, but does not support this view with authority. In fact,

to the contrary, the Commission found the rate bureaus to be service organizations "financed by fee assessments of the members, and not entrepreneurial. As such, the element of profit has been attacked as not compatible with the strict service function of organizations operating with antitrust immunity." *First Report*, 349 I.C.C. at 826. The bureaus act as agents for the carriers and would be in violation of the antitrust laws without the immunity bath furnished by the Commission. All of the expenses of the bureaus are passed on to the shippers and ultimately to the public. If there are services to the public, reimbursement should be on a compensatory basis. The cost of the bureaus as profit-making organizations chargeable to the shipper and the public is inconsistent with the public interest. If this drives the bureaus out of business, so be it. The public will not be saddled with their profits and at the same time afford them antitrust immunity. The orders of the Commission are

Affirmed.

WIDENER, Circuit Judge, concurring and dissenting:

I concur in the opinion of the court in Nos. 76–1329 and 76–1425. But, in No. 76–1426, I respectfully dissent.

In deciding to prohibit rate bureaus from protesting independent action proposals of member carriers, the Interstate Commerce Commission quotes language from *Arbet Truck Lines, Inc. v. Central States Motor Freight*, 321 I.C.C. 460, 471, stating that "[i]t is necessary to harmonize Section 5a [49 U.S.C. § 5b] and Sections 216(e) and (g) [49 U.S.C. §§ 316(e) and (g)] of the Act."

49 U.S.C. § 5b relieves parties to an approved agreement (rate bureaus) from the operation of the antitrust laws. 49 U.S.C. § 316(e) provides in pertinent part:

"Any person, State board, organization, or body politic may make complaint in writing to the Commission that any such rate, fare, charge, classification, rule, regulation, or practice, in effect or proposed to be put into effect, is or will be in violation of this section or of section 317 of this title."

For a number of years the ICC has given effect to both parts of the statute as enacted by Congress. *Central States Motor Common Carriers—Agreement*, 299 I.C.C. 773 (1957); *Southern Motor Carriers—Agreement*, 297 I.C.C. 603 (1956); *Middle Atlantic Conference—Agreement*, 283 I.C.C. 683, 689 (1951).

In *Southern Motor Carriers*, the ICC harmonized the two sections in the following way:

"The right to take independent action by conference members is distinguished from, and does not conflict with, the equally established right of the conference, or any other person or body politic to protest or complain of any such action. After a carrier takes independent action, the action taken stands upon exactly the same footing with respect to the conference, in its efforts to foster a sound and stable rate structure in the interest of its members as a whole, as any such action taken by a carrier not a conference member. To interpret section 5a otherwise would not only contravene the provisions of section 216, paragraphs (e) and (g), as stated, and of the national transportation policy, but would jeopardize the full and free hearing so necessary and essential to the development of complete records in proceedings before the Commission. For the foregoing reasons, we are not in accord with the protestants in their request that the agreement be modified to prohibit the conference from petitioning for the suspension of member-carrier rates or participating in complaint proceedings before the Commission." 297 I.C.C. at 616.

But now, in spite of its findings that "the practice of rate bureaus in protesting rates has been conducted in a manner that is generally fair and devoid of base motives," and in spite of its statement that "[w]e have not found evidence of any flagrant abuse by rate bureaus in the exercise of the right to protest," the ICC declares that the rate bureaus' right to protest must be "subordinated" to the right of independent action.

The statistical background, however, which in this case must speak with more authority than mere feelings, does not show a threat to independent action; indeed I submit the contrary is shown. Of the 7,468 independent actions in 1973, the seven bureaus protested 199, only 2.66 percent. Middle Atlantic, for example, protested 46 of 1,064 independent actions in its tariffs in the twelve months ending May 31, 1973. Thirty-four of the 46 protested tariffs were rejected, suspended, or withdrawn. In 1973, Rocky Mountain Tariff Bureau protested 6 of 320 independent actions in its tariffs. Four of the six protested tariffs were suspended or withdrawn. Southern Motor Carriers Rate Conference protested 26 of the 2,914 independent actions in its tariffs. Thirteen of the 26 protested tariffs were suspended. The low percentage of bureau protests and the high percentage of their success indicate to me that the system is working as Congress intended, that is, as an "advantage and aid to the Commission in the administration of the act and the prevention of destructive rate cutting" in a situation where "[i]t is manifestly impossible, as a practical matter, for the Commission to scrutinize each and all of the multiplicity of tariffs and rate changes that are constantly being filed." *Middle Atlantic Conference*, 283 I.C.C. at 689.

For these reasons, I would preserve the rate bureaus' right to protest as Congress established it in code §§ 316(a) and (g).

Because I rely on the statutory provisions, I find no need to discuss, and express no opinion on, the first amendment issues raised in this appeal and somewhat persuasively presented under the *Noerr-Pennington* doctrine. *Ashwander v. T.V.A.*, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1935) (Brandeis, J., concurring). See *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1971).