CONSOLIDATED RAIL CORPORATION, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Chicago and North Western Transportation Company; William M. Gibbons, Trustee of the Property of the Chicago, Rock Island & Pacific Railroad, as Trustee, and not Individually, the Atchison, Topeka and Santa Fe Railway Company, Burlington Northern Inc., Missouri Pacific Railroad Company, Pittsburgh and Lake Erie Railroad Company, Southern Pacific Transportation Company, Union Pacific Railroad Company, Western Pacific Railroad Company, Soo Line Railroad Company, Intervenors.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Burlington Northern Inc., Missouri Pacific Railroad Company, Pittsburgh and Lake Erie Railroad Company, Southern Pacific Transportation Company, Union Pacific Railroad Company, Western Pacific Railroad Company, Petitioners,

v.

The UNITED STATES of America and The Interstate Commerce Commission, Respondents,

Chicago and North Western Transportation Company, Soo Line Railroad Company, Stanley E. G. Hillman, Trustee of the Property of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Debtor ("Milwaukee Railroad"), Intervenors.

CONSOLIDATED RAIL CORPORATION, Chicago and Northwestern Transportation Company and Soo Line Railroad Company, Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

The Atchison, Topeka and Santa Fe Railway Company, Burlington Northern Inc., Missouri Pacific Railroad Company, Pittsburgh and Lake Erie Railroad Company, Southern Pacific Transportation Company, Union Pacific Railroad Company, and Western Pacific Railroad Company, Intervenors.

Nos. 78–1575, 78–1740 and 79–1640.

United States Court of Appeals,
Third Circuit.

Argued Dec. 11, 1979.

Decided March 28, 1980.

John G. Harkins, Jr. (Argued), Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Consolidated Rail Corp., et al., and for Chicago & Northwestern Transp. Co. and Soo Line R. Co.; Christopher A. Mills, Stuart F. Gassner, Chicago and North Western Transp. Co., Chicago, Ill., C. Harold Peterson, Soo Line R. Co., Minneapolis, Minn., of counsel.

Ronald M. Dietrich, Richard M. Rindler, Charles J. Bloom, Paul A. Cunningham, Philadelphia, Pa., for Consolidated Rail Corp., et al.; Charles P. Northrop, Charles N. Marshall, John A. Daily, Consolidated Rail Corp., Philadelphia, Pa., of counsel.

A. Carl Kaseman, III, Michael W. Freeland, Kenneth S. Levinson, Washington, D. C., for Chicago and North Western Transp. Co. and Soo Line Railroad Co.

Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Gerald B. Fleming (Argued), Atty., I. C. C., Wash-

ington, D. C., for Interstate Commerce Commission.

Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., Howard J. Trienens, R. Eden Martin (Argued), Richard J. Metzger, Sidley & Austin, Chicago, Ill., for the Seven Railroad Group—Atchison, Topeka and Santa Fe R. Co., Burlington Northern Inc., Missouri Pac. R. Co., Pittsburgh and Lake Erie R. Co., Southern Pac. Transp. Co., Union Pac. R. Co., and Western Pac. R. Co.; W. Donald Boe, Jr., Peter M. Lee, St. Paul, Minn., Milton E. Nelson, Jr., Chicago, Ill., Gordon E. Neuenschwander, Pittsburgh, Pa., John MacDonald Smith, R. H. Stahlheber, St. Louis, Mo., Walter G. Treanor, San Francisco, Cal., of counsel.

Before ALDISERT, HUNTER and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Petitioners in these consolidated cases have asked us to review final orders of the Interstate Commerce Commission that formulate and partially implement new car service rules governing the rates paid by the railroads for the use of each other's freight cars. The ICC formulated the new rules pursuant to a 1976 amendment to the Interstate Commerce Act, but chose to implement the new car service rate formula piecemeal, giving immediate effect only to

the revised cost of capital portion of the car service formula while leaving other portions of the formula unaltered. We determine that the ICC does not have authority under § 1(14)(a) of the Interstate Commerce Act, 49 U.S.C. § 11122, to order implementation of only one factor in the car service formula when other factors specifically mentioned by statute are also in need of revision and implementation. We therefore order a stay of the effective date of new basic per diem rates until all factors have been updated by the commission. Although we are ordering a stay, we do uphold the ICC's formulation for the cost of capital portion of its car service rate formula, including its determination to use the effective tax rate of the rail companies in the cost of capital formula used to calculate the basic per diem car service rates.

### I.

The various petitions [1] before us request our review of two final orders of the Interstate Commerce Commission in Ex Parte No. 334, *Car Service Compensation—Basic Per Diem Charges—Formula Revision in Accordance with the Railroad Revitalization and Regulatory Reform Act of 1976*, reflecting decisions of April 3, 1978 (Order 2), and of April 6, 1979 (Order 3).[2] The commission proceeding in Ex Parte 334, as its title indicates, was designed to implement § 212 of the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act)

1. Nos. 78–1575 and 79–1640 are petitions filed by Consolidated Rail Corporation, Chicago and North Western Transportation Company and Soo Line Railroad Company for review of the commission's decisions on reconsideration in Ex Parte No. 334. One final order was served April 3, 1978, and was held in abeyance pending the commission's further reconsideration by order of this court on July 24, 1978. The commission's decision upon further reconsideration was served April 6, 1979. No. 78–1740 is a petition for review filed by the so-called "Seven Railroad Group," which consists of the Atchison, Topeka and Santa Fe Railway Company, Burlington Northern Inc., Missouri Pacific Railroad Company, Pittsburgh & Lake Erie Railroad Company, Southern Pacific Transportation Company, Union Pacific Railroad Company, and the Western Pacific Railroad Company. The Seven Railroad Group has intervened

in Nos. 78–1575 and 79–1640, while Conrail, CNW, and the Soo Line have intervened in No. 78–1740. The three review proceedings were consolidated by our order of June 14, 1979. The petitions are brought pursuant to 28 U.S.C. §§ 2321, 2342, and 2344 to enjoin a final order of the ICC. By motion filed May 25, 1979, Conrail and CNW requested this court to stay the April 6, 1979, order pending judicial review. That motion was denied by order dated June 18, 1979.

2. The commission published a Notice of Proposed Rulemaking and Order on November 17, 1976, 41 Fed.Reg. 50752 (1976), and issued decisions on August 10, 1977 (Order 1), April 3, 1978 (Order 2), April 6, 1979 (Order 3), and June 1, 1979 (Order 4).

which modified § 1(14)(a) of the Interstate Commerce Act to require that charges paid by a railroad for the use of freight cars that it does not own must be fixed on the basis of the costs of ownership, including a fair return on the cost of owning and maintaining each type of freight car.[3]

Petitioners in Nos. 78–1575 and 79–1640, Consolidated Rail Corporation, Chicago and Northwestern Transportation Company, and Soo Line Railroad Company, argue that the commission's per diem rates were formulated by ignoring or misapplying statutory criteria. They argue that the statute calls for a "fair return" and that the agency's orders are the result of an unfair and illegitimate interpretation of the statute, that "current costs of capital" was not properly interpreted, and that costs of repair must be updated. In addition, they urge that the revised rates are too high and violate the policies and purposes of railroad legislation.[4]

Intervenors, the Seven Railroad Group, see note 1 supra, argue that the commission's revision of the current costs of capital portion of the per diem formula was sufficient to meet the statutory mandate of § 212, without concurrent implementation of revised repair costs, or other revisions based on new data. Finally, the Seven Railroad Group, petitioning in No. 78–1740, objects to the commission's decision, in the revised cost of capital formula, to use the railroads' effective tax rate rather than their statutory tax rate. The commission, naturally enough, supports its actions as in compliance with the statute.

## II.

Since the turn of the century, railroads have paid for the use of each other's freight cars on the basis of a per diem rate. This rate, originally based solely on the number of days that a railroad had possession of another's cars, had been fixed by mutual agreement. In order to facilitate interstate commerce, railroads are required to accept from originating railroads loaded freight cars in route to their final destination, rather than shifting the freight between the cars of connecting roads. This is called the car pool system. See generally United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 743, 92 S.Ct. 1941, 1944, 32 L.Ed.2d 453 (1972); Baltimore and Ohio

---

**3.** The 4R Act provided in relevant part:

Sec. 212.(a) Section 1(14)(a) of the Interstate Commerce Act (49 U.S.C. 1(14)(a)) is amended to read as follows:

"(14)(a) It is the intent of the Congress to encourage the *purchase*, acquisition, and efficient utilization of freight cars. In order to carry out such intent, the Commission may, upon complaint of an interested party or upon its own initiative without complaint, and after notice and an opportunity for a hearing, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this part, including (i) the compensation to be paid *for the use of any locomotive, freight car, or other vehicle*, (ii) the other terms of any contract, agreement, or arrangement for the use of any locomotive or other vehicle not owned by the carrier by which it is used (and whether or not owned by another carrier, *shipper, or third party*) and (iii) the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In determining the rates of compensation to be paid for *each* type of freight car, the Commission shall give consideration to *the transportation use of each type of freight car*, to the national level of ownership of *each* such type

of freight car, and to other factors affecting the adequacy of the national freight car supply. Such compensation shall be fixed on the basis of the elements of ownership expense involved in owning and maintaining *each* such type of freight car, including a fair return *on the cost of such type of freight car (giving due consideration to current costs of capital, repairs, materials, parts, and labor)*. Such compensation may be increased by any incentive element . . . ."

(b) The Commission shall, within 18 months after the date of enactment of this Act, revise its rules, regulations, and practices with respect to car service, in accordance with the amendment made by subsection (a) of this section.

The italicized words reflect 1976 modifications of the 1966 amendment to § 1(14)(a). The 1976 statute is now codified without substantive change at 49 U.S.C. § 11122 (1978).

**4.** Petitioners also claim that the commission failed to explain the relationship between the prescribed per diem rates and the goals of § 1(14)(a), in violation of the Administrative Procedure Act. We find this argument to be without merit.

*Chicago Terminal Railroad v. United States*, 583 F.2d 678, 681 (3d Cir. 1978), *cert. denied*, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979). These self-regulating agreements broke down, however, when several railroads refused to pay the per diem rates, and the commission then instituted a proceeding under § 1(14)(a) of the Interstate Commerce Act for the purpose of prescribing, under a code of car service rules, the compensation to be paid for rental of freight cars.

In 1966, Congress first amended § 1(14)(a). The amendments were the product of congressional concern that serious and recurrent freight car shortages were being caused by per diem rates that were too low to encourage car construction but, rather, encouraged terminating railroads to hold cars on their sidings rather than send them back to the owning roads. Because these amendments failed to relieve the endemic car shortages, however, Congress again attempted to solve the problem by passing § 212 of the 4R Act in 1976 to encourage car ownership through adoption of per diem rates that would more accurately reflect the actual costs of purchasing, owning, and maintaining freight cars. By requiring rates that were fully compensatory, Congress hoped to discourage the use of cars not owned and thereby maximize efficient car utilization.

The legislative history of the 4R Act shows that Congress saw the act as a remedy to the major problems of the railroads, among them the fact that the return on investments had been insufficient to enable the railroads to finance capital expenditures. Because the rate of return had been less than the cost of investment for many years, rail car acquisition had not been meeting the needs of the industry. Congress specifically found, for example, that "[n]ot only the Consolidated Rail Corporation ('ConRail'), but the Nation's rail industry at large is today faced with the clearly demonstrable need to make massive capital expenditures to . . . acquire equipment in quantities to enable the National Rail System to properly discharge its common carrier public interest responsibility for prompt and efficient transport;" Congress also foresaw the expenditure of almost two billion dollars for the acquisition of rolling stock and other equipment. S.Rep.No.499, 94th Cong., 2d Sess. 1, 21, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 14, 35. Section 212 of the 4R Act was designed to attack these problems.

The per diem rates in effect prior to the commission's Ex Parte 334 proceedings were those established in the commission's 1968 Per Diem Report. *Chicago Burlington & Quincy Railroad v. New York Susquehanna & Western Railroad*, 332 I.C.C. 176 (1968), *aff'd sub nom. Union Pacific Railroad v. United States*, 300 F.Supp. 318 (D.Neb.), *aff'd sub nom. Boston & Maine Railroad v. United States*, 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142 (1969). The 1966 amendments to § 1(14)(a) required the commission to consider the national level of ownership of a type of freight car and other factors affecting the adequacy of the national freight car supply and then,

> on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices [including efficient utilization and distribution of cars], and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense.

*Union Pacific Railroad v. United States*, 300 F.Supp. at 321.

Section 212 of the 4R Act amended § 1(14)(a) in several significant respects. The 1976 amendment begins by stating: "It is the intent of the Congress to encourage the purchase, acquisition, and efficient utilization of freight cars." For the full text of § 212, *see* note 3 *supra*. The aim of encour-

aging the purchase of new freight cars, as well as their acquisition and efficient utilization, was thus included in a statutory pronouncement for the first time. The inclusion clarifies, we think, congressional intent with regard to another new development, the statutory call for consideration of *current* costs of capital. The commission is now required to determine compensation for the use of a per diem freight car after giving consideration to "current costs."

Other substantive changes in 1976 were that the commission should give consideration to the transportation use of each type of freight car and that the elements of ownership expense should include, not just "a fair return on value," but specifically "a fair return on the cost of such type of freight car (giving due consideration to current costs of capital, repairs, materials, parts, and labor)."

### III.

■ Normally this court's standard of review is set forth in § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, under which the commission's orders would be reviewed to see if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The scope of our review of the commission's actions is generally narrow, limited to whether the commission's conclusions are rationally supported. *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972). A different standard of review applies to issues of statutory construction. We are, of course, not bound by the commission's conclusions if they are based on a misinterpretation of the act. The courts are the final authorities on the proper interpretation of the statute. *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). Therefore, we will examine the statute to see if the commission has the statutory authority for its actions. The question of whether § 212 of the 4R Act should be construed as permitting the commission to adopt new rates only after con-

sideration of all the statutorily enumerated factors is a fundamental question that goes to the basis upon which the agency is empowered by Congress to act. This court need not defer to the agency in drawing its conclusion as to the meaning of the statute or the nature of the agency's power to act. *Volkswagenwerk Aktiengesellschaft*, 390 U.S. at 272, 88 S.Ct. at 935. Administrative discretion and the appropriate scope of review thereof are not relevant until the court first resolves the issue of statutory construction. *Allegheny General Hospital v. NLRB*, 608 F.2d 965, 970 (3d Cir. 1979).

■ It is well established that an agency must consider all factors specifically included in its statutory mandate. *Shannon v. HUD*, 436 F.2d 809, 819 (3d Cir. 1970); *Pennsylvania v. Lynn*, 501 F.2d 848, 855 (D.C. Cir. 1974). *See also ICC v. J–T Transport Co.*, 368 U.S. 81, 89, 82 S.Ct. 204, 209, 7 L.Ed.2d 147 (1961). The courts then perform their function of insuring that the commission has considered all the relevant factors brought to its attention by interested parties and has reached a reasoned decision. *National Industrial Sand Association v. Marshall*, 601 F.2d 689, 699–700 (3d Cir. 1979).

Using these precepts, we will first examine the commission's decision to proceed with the implementation of one revised factor in its new basic per diem formula, the cost of capital factor, even though other factors have not been revised since 1968 and an additional factor, the transportation use of each type of freight car, has been added. We will examine closely, as a matter of statutory construction, the congressional direction to use current costs as a basis for the rates. Our examination of the revised basic per diem formula itself, including the formula for calculating the cost of capital, will then be examined under a narrower scope of review to see that the commission has reached a rationally supported determination.

### IV.

In Orders 2 and 3 the commission has prescribed a formula that went into effect

on June 1, 1979, and included a new current cost of railroad capital factor, adjusted depreciation rates, to which no objections are raised, and a car repair factor that was adjusted upward for inflation but was still based on data over a decade old. Significantly, the rate effective June 1 was not derived directly from the new formula prescribed in Ex Parte 334. *See* note 5 *infra*. The rate did not incorporate any change in the basic car repair factors themselves and thus may not reflect current costs.

The commission has not considered current repair costs up until this time, having postponed review of the repair cost component of its formula until new data were collected. Data were requested by the commission in Order 3, and were originally due to the commission on May 30, 1979. The Association of American Railroads, an industry-wide organization of which all the roads party to this litigation are members, finally submitted the necessary information to the commission on November 26, 1979, shortly before oral argument in this case. As an interim measure, until a new repair cost factor could be computed, the commission factored the old repair cost into an interim rate. According to Conrail, the old repair costs may be significantly higher than the new repair costs still to be computed; at the same time, the new current costs of capital calculated in Orders 2 and 3 are higher than the old costs. The interim per diem rate may thus be higher than the final rate resulting from the use of repair costs which would be updated at the same time as costs of capital. Thus, the result of the agency's action may have been to increase the basic per diem rates beyond the intent of Congress in amending § 1(14)(a). This would not be a proper interpretation of § 212, "[s]uch compensation shall be fixed on the basis of the elements of ownership . . . including a fair return . . . giving due consideration to current costs of capital, repairs, materials, parts, and labor," because *current* repair costs would be eliminated from consideration; the resulting basic per diem rate would be distorted.

What Conrail and the other petitioners in Nos. 78–1575 and 79–1640 object to is the commission's determination that, because the cost of capital section of the new formula, unlike the other sections of the formula, would not require the data by car type first available for the year 1978, and then not until the end of 1979, it would order immediate implementation of the cost of capital section. Conrail argues that the commission's action of partial implementation contravenes congressional intent. We agree, but first we will consider another of Conrail's arguments.

A.

Conrail argues first that the commission misapplied statutory criteria by not giving adequate consideration to whether the promulgated formula resulted in a "fair return" to the owner of the car. The essence of Conrail's argument is that it would not be fair to charge the higher current costs of capital without permitting Conrail the benefit of the lower current cost of car repairs. Although the statute calls for rates determined by the expense of ownership "including a fair return on the [freight car's] cost . . . giving due consideration to current costs . . . ," to the extent that Conrail suggests that the commission could somehow determine the expense of freight car ownership by deciding what would constitute a "fair return" without considering the current costs of any of the various factors enumerated by Congress, it is urging a statutory construction of dubious validity. "Fair return" simply is not a concept that can be isolated from its statutory context. Congress inserted the phrase "fair return" into an economic context and gave the phrase an economic meaning relative to the current costs of various factors. "Fair," in short, has no intrinsic, objective meaning, but should be used in relation to the circumstances of the case. To the extent that Conrail argues that the commission has an obligation to look beyond current costs to some objective standard of fairness outside the statute, we think this would disserve the statutory purpose of the section. Certainly, Conrail is not entitled to any specific rate of return; indeed, its loss-

es have outweighed its gains every year. What constitutes a fair return cannot be determined apart from an economic consideration of costs.

### B.

■ Conrail's stronger argument is that "fair return on the cost . . . giving due consideration to current costs of capital, repairs, materials, parts, and labor" cannot mean that Congress intended further agency consideration to be suspended, even temporarily, after consideration of costs of capital. Capital is only one of five factors listed in that sentence. Although the other four factors were already part of the per diem formula, being factors which were carried forward from the ICC's implementation of the 1966 version of § 1(14)(a), as presently incorporated they do not reflect *current* costs. The pre-1976 version of § 1(14)(a) did not include the word "current." "Current" was added in 1976 in the phrase "current costs of capital." Must the cost of repairs, materials, parts, and labor be "current," as well as the cost of capital? We conclude that they must.

Conrail maintains that the repair cost factor is outdated and results in allowances for repair costs which are much higher than actual repair costs. Conrail's position is that this failure, and the similar failure of the commission to make any attempt to relate its new per diem rates to "factors affecting the adequacy of the national freight car supply" present an issue of statutory construction: should the statute be construed as permitting the commission to order that new per diem rates must be paid, when one or more factors necessary to the establishment of new rates have not been included in the determination?

The intervenors suggest that the issue of repair cost is not really before this court. They argue that on June 11, 1979, the commission declined to open an inquiry into repair costs, that Conrail did not appeal from that order, and that therefore, Conrail cannot now raise a repair cost issue. Conrail is, however, appealing from Order 3, which promulgated new basic per diem

rates without review by the commission (as required by the statute) of the same current costs of car repairs; we will therefore consider this issue.

The commission, claiming administrative discretion, contends that it can and will address the other statutorily mandated factors besides cost of capital at some undetermined future date. But this failure to specify any contemplated date for completion of its statutory assignment is of particular concern to this court. We determine that the commission's orders violate § 1(14)(a) because the commission did not complete its work under § 1(14)(a) before prescribing final orders.

The commission may have felt that promulgation of an interim per diem rate while it completed its determination, based on current data, of new permanent rates for each type of freight car was justified by § 212(b) of the 4R Act, which called for implementation of the statutory amendment within eighteen months, or by August 1977. *See* note 3 *supra* for text of § 212(b). Although it is regrettable that the commission's work has already taken more than four years from the passage of the amendment, we do not consider this a fact justifying imposition of an interim formula that, by introducing some new factors but not others, distorts the old rate basis without conforming to the congressional purpose behind the new compensation rate.

While the commission seeks to justify its approach on the grounds that until it institutes the permanent formula, continued use of the previously determined factors is a reasonable and rational approach, citing *American Commercial Lines v. Louisville & Nashville Railroad*, 392 U.S. 571, 590–93, 88 S.Ct. 2105, 2115, 20 L.Ed.2d 1289 (1968), this court cannot accept an improper melding of the old and the new rates as reasonable. In *American Commercial Lines* the Supreme Court sanctioned the commission's adherence to previously established rates until it completed its overall examination of whether new rates would be just and reasonable and in accordance with the statutory standard. Here, the commission does not seek

to continue to apply an old rate, but rather to introduce a modified rate on an interim basis.

The threshold issue is whether the commission, in Ex Parte 334, has properly construed its statutory mandate under § 1(14)(a) of the Interstate Commerce Act, 49 U.S.C. § 11122. In this case, the commission erroneously determined that it could set interim rates under § 1(14)(a) using a formula that included new calculations for the "current costs of capital" but relied on the old data and calculation for, *inter alia*, the repair costs of the railroad cars. This determination was made notwithstanding the commission's initial decision in Order 1 of Ex Parte 334 that it would be necessary to compute actual, current repair costs. App. at 1003a.

In addition to the five factors specifically enumerated, "capital, repairs, materials, parts, and labor," § 212 also requires the ICC to consider "the transportation use of each type of freight car, . . . the national level of ownership of each such type of freight car, and . . . other factors affecting the adequacy of the national freight car supply." These factors are designated, we think, as important factors to be used in encouraging the efficient use of freight cars. We are persuaded that these factors were also not considered, as they should have been, by the ICC before it proceeded to implement the cost of capital part of its new 334 formula.

### C.

The failure to consider current costs of car repairs in the face of evidence that the existing factors may be overcompensatory, the additional failure of the interim formula to prescribe rates for each type of freight car, and the failure to make any findings as to "factors affecting the adequacy of the national freight car supply" are all errors in the application of the statute. These errors convince us to suspend the imposition of the new interim per diem rates until the commission has determined exactly the current costs of all the factors Congress enumerated in § 212. Since the data on repair costs have now been submitted to the commission, it should not be too long until the commission can fully implement the formula it set out in its initial order in Ex Parte 334. In this regard, we note that the railroads themselves will assist the commission by submitting suggested rates based on current data.

### V.

█ The fact that the statutory formula could not be implemented until after receipt of the data by car type late in 1979 is only reason to suspend implementation of the cost of capital factor until such time as all portions of the new basic per diem formula can be implemented. It is not a reason to vacate the commission's orders in their entirety. The commission did consider all of the statutory factors in determining a new basic per diem formula. It has not yet, however, implemented the results of its consideration. As soon as the commission is able to implement those results, the factors will become part of the enforceable rate and the statutory mandate will be fulfilled.

The commission having fully determined a permanent basic per diem formula, there is no reason that the formula, *qua* formula, should not be reviewed at this time. Although we will reverse that part of Order 3 which sought to implement the cost of capital factor of the revised basic per diem formula, in reviewing that factor with the other factors analyzed in Orders 2 and 3 we uphold the commission's determination, including its formulation of the current cost of capital.

The ICC developed the following formula for calculating the cost of capital:

*Formula for calculating cost of capital*

| Line No. | Item (1) | Source (2) | Amount (3) |
|---|---|---|---|
| | | | *Percent* |
| 1 | Interest rate on new debt | . . . Ex Parte No. 353, Adequacy of Railroad Revenue (1978 Determination). | 8.4 |
| 2 | After tax cost of equity | . . . . Ex Parte No. 353, Adequacy of Railroad Revenue (1978 Determination). | 13.0 |

| Line No. | Item (1) | Source (2) | Amount (3) |
|---|---|---|---|
| 3 | Pre-tax cost of equity ...... | Line 2 divided by (1 minus the effective tax rate) (for 10 selected roads [1]).[2] | 14.30 |
| 4 | Weighted cost of debt ...... | Line 1 multiplied by 0.40 [3] | 3.36 |
| 5 | Weighted cost of equity .... | Line 3 multiplied by 0.60 [3] | 8.58 |
| 6 | Cost of capital ............ | Sum of lines 4 and 5 | 11.94 |

1. ATSF, BN, C&O, DRGW, MoPac, N&W, SCL, SOU, SP, UP.

2. Effective tax rate was found by dividing the total Federal income taxes paid by the 10 selected roads by their total net income before extraordinary items and Federal taxes. Source: Transport Statistics in the U.S., Section A–1. Average of latest 3 years (9.1 percent).

3. Source of 40/60 debt/equity split is Ex Parte No. 353, Adequacy of Railroad Revenue (1978 Determination).

App. at 1654a. This formula in turn is part of the basic per diem rate formula developed by the ICC in Order 1 in 1977, which reflected its consideration of five factors: age and value brackets of the cars, depreciation, repair costs, capital, and transportation use.[5]

5. Order 1, App. at 981a. The commission's summary discussion of these factors in 1977 was:

> The first factor is Age and Value Brackets of the cars. The Car Hire Rate Table (Summary 4 of Appendix III) employs narrowband, $1,000 value brackets and one-year age brackets. This refinement in the classification of car types by age and value will produce per diem charges that more accurately reflect the true ownership costs for each individual car.
>
> The second factor is Depreciation. Rates of depreciation for each type of car are based on the average service life and salvage value determined from national railroad data. The rates are determined using statistical actuarial analysis of the data.
>
> The third factor is Repair Costs. A 3-year moving average is used to develop average car repair costs while normalizing fluctuations in car repair activity resulting from inflation or deflation. It provides assurance that the car owner is reimbursed for an amount nearest to what it will cost to repair its cars. Until 3 years of reporting has been completed, the first year will stand on its own, the second year will employ a 2-year average, and the third year and thereafter will employ a 3-year moving average. Allocation factors are used to distribute various

Of these five factors, only three, cost of capital, transportation use, and depreciation, were discussed in Order 2 in 1978. Of these three factors, only cost of capital was discussed in Order 3 in Ex Parte 334, the April 1979 order. In addition, in Order 3, the ICC requested that the additional data by car type needed to implement the new 334 formula be filed by May 30, 1979. The entire formula could not be implemented until this information had been filed with the ICC.

Conrail raises several objections to the cost of capital portion of basic per diem formula. First, Conrail objects to the ICC's using the cost of capital for the railroad industry as a whole instead of the cost of capital for freight cars alone. Since freight cars have been in short supply for so long, they have always been in demand. Freight cars have been assured of producing revenue and are somewhat fungible, in that any railroad can use them, no matter which they were built for. Because freight cars are not a high risk investment, debt financing has been readily available to underwrite their purchase. This situation may be con-

> operating expenses. These factors with minor modifications are the same as have been used prior to this proceeding, and it is anticipated that they will be updated after freight car repairs are developed by each railroad based on the actual costs experienced and separated between ownership costs, other expenses, and general overhead items.
>
> The fourth factor is Cost of Capital. . . . [This was later revised in Orders 2 and 3.]
>
> The fifth factor is Transportation Use. Pursuant to the 4-R Act, the above-mentioned costs considered in this proceeding to determine the compensation for the use of freight cars must be related not only to the level and the adequacy of the national car supply but also to the transportation use of each type of car. Transportation use is a function of the time and distance which cars are used, and adherence to it avoids compensation for any costs related to providing cars for other uses. A car-day divisor and a car-mile divisor are calculated and incorporated into the formula to reflect transportation use of each type of car.
>
> We have considered all of the above factors and made the above conclusions in order to develop the per diem formula.

App. at 1099a–100a.

trasted with that of the industry as a whole, which has been a risky investment in recent decades, and whose other major capital investment, railroad beds, rails, and rail yards, are not fungible. The commission decided that the appropriate base for determining the cost of capital is the overall capital structure of the industry, and not just a single class of assets. While freight cars may be fungible, they are still intimately related to the railroad industry. Without railroad companies to use them, freight cars would have no value. Therefore, as a capital asset, as opposed to a debt security, freight cars have the same cost of capital as the rail industry as a whole.

Conrail objects specifically to the equity/debt ratio used by the ICC in calculating cost of capital. See Formula for calculating cost of capital, lines 4 and 5, supra. The ICC determined to use a 60/40 ratio, with 60 percent of the cost of capital made up by the cost of equity and 40 percent determined by the cost of debt. This ratio represents the cost of investments to the rail industry as a whole. But Conrail complains, in a variation on the theme discussed above, that freight cars are financed almost entirely by debt financing. Freight cars, as we noted, are able to attract debt financing, whereas other needs of the rail industry must be met by the use of equity. But it is the overall cost of capital that is relevant to the decision whether to proceed with an investment in new equipment at all. Only after the decision to invest has been made and the issue of how to finance the particular equipment needed arises does the relevance of the cost of alternative means of financing come into play.

The rate on a debt instrument that is secured by an asset does not indicate the true cost of the capital invested in that asset because the debt rate fluctuates with, among other things, the degree of security enjoyed by the lender, a factor not related to the business risk to the owner of the asset. A railroad might finance the purchase of one freight car with 80 percent debt, 20 percent equity, another with 60/40 debt/equity, and a third with 100 percent equity. From the railroad's standpoint, the risks of those investments would be the same in each case, and the opportunity cost of the capital to the railroad is therefore the same in each case, no matter how it finances the three freight cars.

Although the fact that railroad debt secured by freight cars bears a lower rate than other debt is, at least in part, an indication that freight cars are better security than other rail assets, the rate on such debt is not directly related to the cost of the capital invested in the assets that secure the debt. Although the total interest of all equity and debt holders necessarily equals the total cost of capital in the assets of the enterprise, the differing allocations of risk among investors, by such mechanisms as posting the firm's assets as security for secured debt interests or giving first claim on profits to preferred stock, means that the risk borne by any particular investor would never, except by accident, equal either the total cost of capital to the firm, or the cost of capital invested in particular assets. Railroad lenders look to the total revenues of the railroad—not just revenues earned by equipment. The lender is thus affected by the general risks of that railroad as a railroad—such as the risk that shippers will be lost to competition, or that shippers will be unable or unwilling to pay compensatory rates, or that expenses will exceed freight revenues, or that freight cars will be destroyed in accidents. The lender also looks to total firm assets, and not just to the specific collateral.

Conrail further objects to the commission's use of the current cost of debt in calculating a weighted average of debt and equity, rather than the lower embedded cost of debt. The current cost of debt reflects recent higher interest rates, whereas the embedded cost of debt would be the average of all interest rates at which the railroads have obtained debt financing, including some old low interest rates no longer available. The statute, however, specifically calls for consideration of the "current" cost of capital and the purpose is to encourage the purchase and acquisition of new freight cars that could only be obtained at

current interest rates. The commission's decision here seems amply justified.

Conrail also argues that the new rates frustrate other congressional policies concerning railroads embodied in the Regional Rail Reorganization Act of 1973 and in the National Transportation Policy, 49 U.S.C. § 10101. The goal of the 3R Act was to preserve rail service in the midwest and northeast regions, where it was threatened by the insolvency of several carriers. In the 4R Act, however, Congress sought "to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States." § 101 of the 4R Act, 45 U.S.C. § 801. In other words, the goal of the 4R Act was the revitalization of the national rail system; it did not focus solely on the midwestern and northeastern roads. We also find that the National Transportation Policy's emphasis on promoting sound economic conditions for carriers is furthered by the formula developed in Ex Parte 334.

We have also examined various other arguments urged by petitioners in Nos. 78–1575 and 79–1640 and we find them to be without merit.

## VI.

█ In a separate petition, the Seven Railroad Group has asked us to review the choice of tax rate selected by the commission in its formula for cost of capital. *See* Formula for calculating cost of capital, line 3 and n. 2, *supra*. The commission chose to use the effective tax rate. The Seven Rail-

road Group would have the commission use the higher statutory tax rate in the formula on the theory that using the lower effective tax rate will improperly deprive the owners of new freight cars of certain tax benefits. The question is whether § 203(e)[6] of the Revenue Act of 1964 should compel the commission to use the statutory tax rate or whether § 212 of the 4R Act requires the commission to use the effective tax rate. We conclude that the commission did not commit reversible error in deciding that the strictures of the 4R Act controlled its choice of tax rate.

Prior to the passage of § 203(e), utility commissions had been forcing utilities that were eligible for investment tax credits to allow those benefits to flow through to their customers, thus depriving the utility companies of the benefits. In 1964, Congress sought to prohibit this removal of the incentive to invest in new equipment. *See* S.Rep. No. 830, 88th Cong., 2d Sess. __, *reprinted in* [1964] U.S.Code Cong. & Admin.News 1673, pp. 1714–15, 1716–17. The legislative history shows that Congress intended that customers of regulated industries not receive a flow through of benefits. *Id.*

Intervenors in No. 78–1740 argue that the intent of Congress should not be construed to mean that other railroad companies who accept per diem cars on their lines are customers for purposes of § 203(e) of the originating railroads. The customer in each case, argues Conrail, would continue to be the shipper, even after a car was transfer-

---

**6.** § 203(e) of the Revenue Act of 1964 provided:
Treatment of Investment Credit by Federal Regulatory Agencies.—It was the intent of the Congress in providing an investment credit under section 38 of the Internal Revenue Code of 1954, and it is the intent of Congress in repealing the reduction in basis required by section 48(g) of such Code, to provide an incentive for modernization and growth of private industry (including that portion thereof which is regulated). Accordingly, Congress does not intend that any agency or instrumentality of the United States having jurisdiction with respect to a taxpayer shall, without the consent of the taxpayer, use—

(1) in the case of public utility property (as defined in section 46(c)(3)(B) of the Internal Revenue Code of 1954), more than a proportionate part (determined with reference to the average useful life of the property with respect to which the credit was allowed) of the credit against tax allowed for any taxable year by section 38 of such Code, or

(2) in the case of any other property, any credit against tax allowed by section 38 of such Code.
to reduce such taxpayer's Federal income taxes for the purpose of establishing the cost of service of the taxpayer or to accomplish a similar result by any other method.

red off-line. Petitioners argue that § 203(e) mandates use of the statutory tax base here, because otherwise they will be deprived of the tax benefit intended for the owner/investor in depreciable property under 26 U.S.C. § 38. They urge that to the extent that users of per diem cars are required to pay compensation to the owners of those cars, the users should be considered customers paying for service provided by the taxpayer/owners.

So far as railroad rates to shippers are concerned, the commission has prevented the flow through of tax benefits by using the statutory rather than the effective tax base. *See, e. g.,* Ex Parte No. 338, *Standards and Procedures for the Establishment of Adequate Railroad Revenue Levels* (served February 3, 1978), at 83. But in an effort to conform the cost of capital formula in Ex Parte 334 with the statutory mandate of § 212 of the 4R Act, which calls for a rate based on the costs of ownership, giving consideration to current cost of capital, the commission selected the effective tax rate as the more appropriate.

The commission urges that its use of the effective tax rate does not violate the Revenue Act provision at all because the basic per diem rate is not a cost of service, but is a shared ownership cost. The service provided by railroad companies, according to this argument, would be the hauling of freight for shippers. And the cost of services to shippers does not reflect any flow through of tax benefits. *E. g.,* Ex Parte 338. The Seven Railroad Group has expressed concern that the use of the effective tax rate will prove a disincentive for railroads to acquire new freight cars. The commission argues, however, that the use of the statutory tax rate in setting freight rates themselves, as opposed to the rates for the use of freight cars, preserves enough incentive to use the cars efficiently.

The issue is one of determining the proper choice of the controlling legal precept. On the one hand, § 203(e) of the Revenue Act prohibits the flow through of tax benefits to reduce the cost of service of the taxpayer. On the other hand, the basic per diem rate is to reflect current costs of capital. A permissible inference to be drawn from § 203(e) would be that the statutory tax rate should be used so that owner railroads might benefit from any tax credits provided for owners of depreciable property. Such an inference would tend to support petitioners' position. In contrast, the mandate of the 4R Act is to set basic per diem rates that reflect the costs of ownership of freight cars. The specific directions to consider certain factors show a congressional concern with accuracy. Because the use of the statutory tax rate would inaccurately reflect the true costs of ownership, in that the railroads actually pay a lower effective tax, a proper inference to be drawn from the 4R Act is that the appropriate rate for projecting current costs is the effective tax rate.

Faced with the conflict between two acts of Congress, the commission chose to resolve the tension by following the inference to be drawn from the 4R Act. We find no reversible error in the commission's choice of the 4R Act as the controlling legal precept in calculating the costs of capital for purposes of per diem rates. By using the effective tax rate in its cost of capital formula, the commission can most accurately calculate the actual, current costs of ownership of freight cars.

### VII.

Accordingly, the orders of the ICC will be affirmed and their review denied except for that part of the April 6, 1979 decision that calls for implementation of the cost of capital portion of the new basic per diem formula prior to the new formula's full implementation. We have determined that full implementation must occur at one time, after the commission has analyzed the data submitted by car type. The petitions for review will be granted in part and the order of the commission implementing the cost of capital factor as of June 1, 1979 will be vacated. In all other respects the petitions for review will be denied.