**LO SHIPPERS ACTION COMMITTEE, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION, and United States of America, Respondents,**

U.S. Clay Producers Traffic Association, Inc., Association of American Railroads, et al., Intervenors.

No. 87–1486.

United States Court of Appeals, District of Columbia Circuit.

Argued April 28, 1988.

Decided Sept. 23, 1988.

Harold E. Spencer, with whom Stephen C. Herman, Chicago, Ill., was on the brief, for petitioner.

Louis Mackall V, Attorney, I.C.C., with whom Robert S. Burk, Gen. Counsel, and Henri F. Rush, Deputy Gen. Counsel, I.C.C., and John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

J. Michael Hemmer, with whom Paul R. Duke, Robert D. Fram, Elizabeth V. Foote, John B. Norton, J. Thomas Tidd, Washington, D.C., John S. Walker, Denver, Colo., Dennis W. Wilson, William R. Power, Robert T. Opal, Chicago, Ill., Emried D. Cole, Jr., Paul R. Hitchcock, Paul A. Cunningham, Richard B. Herzog, Robert G. Shepherd, Jr., Washington, D.C., Michael Roper, Louis P. Warchot, San Francisco, Cal., and Mark A. Kalafut, Omaha, Neb., were on the joint brief, for intervenors The Association of American Railroads, et al. J. Stephen Lawrence, Jr., Washington, D.C., also entered an appearance for intervenors, Ass'n of American Railroads, et al.

Henry M. Wick, Jr., Pittsburgh, Pa., was on the brief for intervenor U.S. Clay Producers Traffic Ass'n, Inc.

Mark L. Evans and James P. Tuite, Washington, D.C., entered appearances for amicus curiae, BRAE Corp. and Itel Rail Corp.

Before MIKVA and SENTELLE, Circuit Judges, and PALMIERI,* Senior District Judge.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

LO Shippers Action Committee ("LO-SAC") brought a complaint before the Interstate Commerce Commission ("ICC" or "the Commission") against several railroads alleging that the allowances provided to LOSAC's shipper/members for the use of their own railroad cars were inadequate as a matter of law and seeking the establishment of Commission-ordered allowance structures. The ICC dismissed the complaint. LOSAC now petitions this Court for review of that ICC decision. Finding no error, we affirm the agency's dismissal and deny petitioner's request for relief.

## I. BACKGROUND

### A. *General.*

Railroads, as common carriers, generally furnish the cars and equipment necessary to perform the transportation services provided under their tariffs. However, under some circumstances, a shipper provides its own (or a leased) railroad car or a railroad makes use of a car belonging to another carrier. In those cases, the railroad provides compensation to its shipper through "allowances" on a mileage basis or to the other line through "per diem." This practice is addressed by 49 U.S.C. § 11122 (1982), which provides:

(a) The regulations of the Interstate Commerce Commission on car service shall encourage the purchase, acquisition, and efficient use of freight cars. The regulations may include—

(1) the compensation to be paid for the use of a locomotive, freight car, or other vehicle;

(2) the other terms of any arrangement for the use by a rail carrier of a locomotive, freight car, or other ve-

hicle not owned by the rail carrier using the locomotive, freight car, or other vehicle, whether or not owned by another carrier, shipper, or third person; and

(3) sanctions for nonobservance.

(b) The rate of compensation to be paid for each type of freight car shall be determined by the expense of owning and maintaining that type of freight car, including a fair return on its cost giving consideration to current costs of capital, repairs, materials, parts, and labor. In determining the rate of compensation, the Commission shall consider the transportation use of each type of freight car, the national level of ownership of each type of freight car, and other factors that affect the adequacy of the national freight car supply.

LOSAC is an association of shippers using and providing covered hopper cars commonly known in the railroad industry as "LO cars." LO cars are used in virtually all rail movement of grain, grain products, fertilizers, and many chemical products. These cars in common with refrigerator cars, tank cars, and a few other private cars, are frequently furnished by shippers triggering the use of allowance compensation. Allowances are published as tariffs. *Tank Car Allowances, Southern Ry. System,* 329 I.C.C. 466, 476 (1967). Since at least the 1960's, these rates have been the subject of continuing dispute between the railroads on the one hand and the LO shippers on the other. LOSAC, formed in 1970, has functioned as the speaking mechanism of the shippers in the continuing dispute. In 1980, LOSAC reached an agreement with the railroads as to the structure and payment of such allowances. The 1980 agreement reflected national average costs of ownership. All parties operated under the agreement until May 25, 1982, when the railroads notified LOSAC of their intention to terminate the agreement and cease

---

* Of the United States District Court for the Southern District of New York, sitting by designation

pursuant to 28 U.S.C. § 294(d).

periodic updates which it had provided.[1]  In February of 1983, LOSAC filed a formal complaint with the ICC against 252 railroads charging that the railroads' allowances were below applicable costs of owning and maintaining LO cars and, LOSAC contends, in violation of subsection 11122(b). LOSAC's complaint sought a determination that the present allowance structure violates that subsection and asked the ICC to require the railroads to pay future allowances consistent with the standards of subsection 11122(b) as well as damages for past allowances below that standard.

The railroads answered that subsection 11122(a) does not require the ICC to regulate allowances, and, if the ICC does regulate allowances, the statutes taken as a whole provide for the payment of below cost, market-based allowances in appropriate circumstances.  The ICC heard oral argument in December of 1986 and held public deliberations February 24, 1987, at which a majority of the commissioners accepted the arguments of the railroads and voted to deny relief to LOSAC. On August 31, 1987, the Commission issued its written decision denying relief.  *LO Shippers Action Comm. v. Aberdeen & Rockfish Ry. Co.*, 4 I.C.C.2d 1 (1987).  LOSAC then filed this petition for review.

### B.  *The ICC Decision.*

After reviewing the parties' positions, the ICC described the consequences of the relief LOSAC sought: (1) huge damage claims with "serious" financial consequences for the railroads and (2) a loss of congressionally granted flexibility for the railroads in setting their rates for transportation in railroad-owned cars at levels com-

petitive with other means of transportation. This latter effect followed, per the ICC, from the necessary combined effect of higher allowances to private-car shippers and anti-price discrimination requirements. The Staggers Rail Act of 1980, Pub.L. No. 96–448, § 201(a), 94 Stat. 1898, 1899 (1980) (codified at 49 U.S.C. § 10701a(c) (1982)) ("Staggers Act"), had given the railroads flexibility to reduce their rates to cover only their variable costs in depressed markets;  the ICC viewed it as anomalous to permit railroads to have rate flexibility to compete in competitive markets and simultaneously to require that they pay higher, "inflexible"[2] cost-based allowances that make attainment of the first goal impossible.  4 I.C.C.2d at 9.

The ICC concluded that LOSAC's interpretation of the statute as requiring that it prescribe fully compensatory allowances is "simply wrong."  *Id.*  It read subsection 11122(a) as giving it discretion to regulate the subject, noting that it had never before prescribed allowances for LO cars "even in the heyday of regulation."  *Id.*  Second, the ICC determined that it must consider factors referenced in the second sentence of subsection (b) as well as the cost factors mentioned in the first sentence.  The ICC viewed the legislative history as clear that subsection (b), considered as a whole, permits below-cost allowances.

The ICC next considered "whether the goals of the statute can best be served by allowing individual carriers to continue to publish allowances or by prescribing allowances for the entire industry."  *Id.* at 11. The Commission found no need to prescribe industry-wide allowances, especially in light of the Staggers Act preference for individual over collective rate-making, and

---

**1.** LOSAC did not try to enforce the agreement *qua* contract.  Count 1 of the complaint alleged that the railroads' failure to make the agreed updates to the previously-agreed allowances constituted an unjust and unreasonable practice "and results" in unlawful allowances.  Joint Appendix 52–53. The ICC stated in its opinion that lawfulness of the railroads' allowances under subsection 11122(b), not adherence to the 1980 agreement, was the issue in the case and LOSAC agrees.  *LO Shippers Action Comm. v. Aberdeen & Rockfish Ry. Co.*, 4 I.C.C.2d 1, 3 (1987);  *see* Brief for Petitioner at 36.  Accordingly, we have

no issue before us regarding the 1980 agreement as such.

**2.** LOSAC objects to the ICC's "inflexible" characterization, pointing out its submission of a variable formula.  The ICC's usage, however, seems simply to emphasize that LOSAC's construction of the statute imposes an absolute floor on allowances of full-cost recovery, regardless of how sophisticated the formulas by which the level of that floor is determined.

saw the congressional purpose behind section 11122 as encouraging an *appropriate* supply of cars. *Id.* at 12. The ICC reasoned that granting LOSAC's requested relief was not required to ensure an adequate supply because the present supply of LO cars is more than adequate and was principally acquired when allowances were lower and were not periodically updated. *Id.* at 12–13. Moreover, the ICC reasoned that an increase in allowances would be inconsistent with the "efficient use," 49 U.S.C. § 11122(a), of cars that the ICC is statutorily required to encourage since the rate increases occasioned thereby would cause railroads to lose traffic to other means of transportation aggravating the surplus of idle cars. 4 I.C.C.2d at 13. The Commission believed the "transportation use," 49 U.S.C. § 11122(b), factor also supported its decision to take no action, since LO cars are used primarily for grain shipments, a highly competitive market, and the ICC believed that the record before it indicated that the allowance caps complained of were not significant outside the grain context. 4 I.C.C.2d at 13. The Commission concluded that the railroads' allowance levels had not been shown to be unlawful under section 11122. 4 I.C.C.2d at 13–14.[3] Finally, the ICC concluded that acceptance of LOSAC's proposed cost-floor standard for allowances was not necessary to protect LO shippers from abuse of market power by railroads. *Id.* at 18–19.

## II. ANALYSIS

### A. *The Decision for Review.*

■ While maintaining the inadequacy of the Commission's written decision issued in August, 1987, LOSAC asserts that the decision for our review is in fact the transcript of the February 24, 1987, conference. At that publicly-conducted conference, the same majority of commissioners who later joined fully in the published decision voted to deny relief, and the same two commissioners who later dissented in part voted

against the majority on some questions. LOSAC argues that the vote at this public conference was the decision and that we must, therefore, scrutinize the transcript and disregard the subsequent published decision as a *post hoc* rationalization.

This we decline to do. The ICC's formal opinion is its decision because the commissioners retained full authority to approve, disapprove, or modify it until published. LOSAC does not contradict this assertion or contend that the February 24 vote had immediate effect. This is, however, the critical difference between this case and our decision, cited by petitioner, in *Pan American World Airways, Inc. v. CAB*, 684 F.2d 31 (D.C.Cir.1982) (per curiam).

In *Pan Am* the Civil Aeronautics Board ("CAB"), after an unlawfully closed board meeting, issued an emergency order that lacked statutorily required findings of fact. Those followed twelve days later. On review of the order, this Court considered both the subsequently issued findings and a transcript of the preceding board meeting. *Id.* at 36 & n. 12. The majority and dissenter both distinguished the case there from a hypothetical case in which a decision, although made, had not been *"irreversibly made."* *Id.* at n. 12 (emphasis original); *see also id.* at 51 (Wilkey, J., dissenting). The situation before us now is the *Pan Am* hypothetical, and very closely resembles that in *Kansas State Network, Inc. v. FCC*, 720 F.2d 185, 191–92 (D.C.Cir. 1983). In *Kansas State*, the FCC had ruled against a party in a published decision. On review, the party submitted a transcript of an open meeting to demonstrate that it was the victim of agency unfairness. We struck the transcript from the record as part of protected pre-decisional processes. While we recognized in that case that *Pan Am* had involved our review of a transcript, we noted that the agency in *Pan Am* had not supplied a contemporaneous statement of reasons necessitating a review of the transcript in order "to dispose of the issue of whether the agency

---

**3.** In further determinations that have not been brought before us by LOSAC's petition, the ICC rejected LOSAC's charges of unreasonable practices by the railroads and found that it was permissible for a carrier not to pay an allowance but to instead publish separate rate schedules for hauling in railroad- and shipper-furnished cars. 4 I.C.C.2d at 14–18.

had complied with the Sunshine Act." *Kansas State Network,* 720 F.2d at 192. We further noted that the agency's failure in *Pan Am* to provide a written decision made it impossible for us to assess the reasonableness of the board's action without an examination of the transcript. None of these factors prevails here. Following in the footsteps of *Kansas State,* we limit our review to reasons given in the ICC's published decision and, absent a compelling indication of error, we must defer to the Commission's interpretation of the statute, with the administration of which it is charged. *Black v. ICC,* 762 F.2d 106, 114–15 (D.C.Cir.1985).

### B. *The Commission's Action.*

■ The Commission ruled, contrary to LOSAC's contention, that it was within its discretion whether or not to issue regulations providing industry-wide terms for the use of non-railroad-owned equipment. LOSAC's contention that the statute *mandates* such regulation is based on the use of the word "shall" in 49 U.S.C. § 11122(b). As LOSAC notes, congressional use of "shall" indicates the congressional of discretion. *MCI Telecommunications Corp. v. FCC,* 765 F.2d 1186, 1191 (D.C.Cir.1985). However, LOSAC's argument here takes the word out of its statutory context. Subsection (b) relates not to whether or not industry-wide rates should be regulated but rather to what factors should be, indeed, must be, employed in determining what those rates will be if and when regulated. The relevant portion of the statute in the first instance is subsection (a) which specifies that the "regulations *may* include" the sort of regulations now sought by petitioner. (Emphasis supplied.) Just as the use of the word "shall" indicates the absence of discretion, the use of "may" indicates its presence. *See Matzke v. Block,* 732 F.2d 799, 801 (10th Cir.1984). While we recognize that the context of a particular usage may at times require the construction of "may" as mandatory or "shall" as permissive, no such modifying context is present here. *Cf. United Hosp. Center, Inc. v. Richardson,* 757 F.2d 1445 (4th Cir.1985). Accordingly, the Commission's determina-

tion that it was not required to prescribe compensation levels was within its statutory discretion, and we will not disturb that determination.

LOSAC's contention that the interpretation of this statute is for the court and that the ICC construction is not entitled to deference does not change our decision. *Consolidated Rail Corp. v. United States,* 619 F.2d 988 (3d Cir.1980), cited by LOSAC compels no different result than we reach. In that case, the Third Circuit noted quite rightly that the courts and not the agencies are "the final authorities on the proper interpretation of ... statute[s]." *Id.* at 993 (citations omitted). The Third Circuit was reviewing the ICC's formulation of new rate regulations covering the per diem paid by a car-user line to a car-owning railroad. This involves construction of the predecessor statutes to the one we now construe, the predecessors being substantively the same as the present version. However, the question before the Third Circuit was not whether the Commission was required to regulate, but whether in regulating, it was required to consider all the enumerated factors. The Commission in that case had in fact expressly set the rates on the basis of reviewed cost of capital while expressly not considering the other factors listed in the statute. While that case held that Congress had mandated a consideration of all factors, not a portion, the case simply does not address the same question we face here. Neither does the decision stand for the proposition that the Commission is owed no deference on its interpretation of section 11122 when its decision does, as here, take into account all statutorily enumerated factors.

Neither is *MCI Telecommunications Corp. v. FCC,* 765 F.2d 1186 (D.C.Cir.1985), cited by petitioner, authority for the proposition that the ICC does not have discretion to prescribe allowances. In *MCI,* the FCC had prohibited non-dominant carriers from filing tariffs, effectively requiring them to enter into individual contracts with customers. The applicable statute expressly provided, however, that " '[e]*very* common carrier ... *shall* ... file' " tariffs. *Id.* at

1191 (quoting and emphasizing 47 U.S.C. § 203(a) (1982)). The FCC contended that its express statutory authority to " '*modify any requirement made by ... this section,*' " *id.* (quoting and emphasizing 47 U.S.C. § 203(b)(2) (1982)), empowered it to take its action, but we held that the FCC had no authority to prohibit companies from filing tariffs. *Id.* at 1188. In the present case, however, Congress clearly granted the ICC discretion as to the precise subject at issue here. Accordingly, we find that the Commission is due the deference normally owed an agency's interpretation of a statute committed to its care.

■ LOSAC's argument that the Commission must disapprove market-based allowances which are below cost as computed under the first sentence of subsection 11122(b) likewise compels no disturbance of the Commission's decision. The two sentences of that subsection must be read together. *See Consolidated Rail*, 619 F.2d at 993. The first is directed to the cost factors relied upon by LOSAC; the second to market factors which the Commission found to compel reduction below cost. Each sentence speaks with the imperative "shall." In neither sentence, nor in the two taken together, did Congress provide any conclusive evidence as to the relative weight to be afforded the various factors. It is by now hardly necessary to restate the principle that when Congress explicitly or implicitly leaves "a gap for the agency to fill," the courts will not substitute our own interpretation for that of the agency but will uphold the agency's interpretation provided only that it is a reasonable one. *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

The Commission's interpretation here is more than reasonable. The Commission has previously determined that the statutory factors, considered together, do not require that railroads pay rates of compensation that guarantee full-cost recovery to car-providing shippers. This construction is consistent with the ICC's decision in *Order Granting Railroads Flexibility in Setting Per Diem Levels*, 364 I.C.C. 107, 108–10 (1980), in which the Commission authorized railroads to reduce compensation charges for the use of their cars by other railroads below established inter-railroad "per diem" compensation rates "as a means of discouraging cross-hauling of empty cars ... and hence as a means of improving car utilization" during a period of car surplus. *Id.* at 108. This decision was referenced with evident approval in the conference committee report to the Staggers Act,[4] H.R.Rep. No. 96–1430, 96th Cong., 2d Sess., at 117 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 4149, with the added suggestion that the Commission permit per diem to rise *above* basic per diem when there is a car shortage. H.R.Rep. No. 96–1430, *supra*, at 118. The conference committee report states an intent that "marketplace decisions govern the railroad industry and its relationship with shippers." *Id.* at 118 (quoted at 4 I.C.C.2d at 11). The legislative history cited by the ICC relates to section 224 of the Staggers Act, which dealt solely with compensation-related matters. *See* Pub.L. No. 96–448, § 224, 94 Stat. at 1929–30. The ICC's resort to legislative history adequately supported its construction of the language of the statute. LOSAC's counter-arguments do not compel the con-

---

**4.** The Staggers Act repealed paragraph 11122(b)(2), which had authorized the Commission to establish an incentive increment to basic compensation when there was an inadequate car supply. Pub.L. No. 96–448, § 224(a)(1), 94 Stat. at 1929. The repealed paragraph read in its entirety as follows:

The Commission may increase a rate of compensation determined under paragraph (1) of this subsection by an incentive element only when the Commission finds that the supply of a type of freight car is inadequate and an incentive element will compensate freight

car owners contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and national defense. The Commission may exempt that incentive element from the compensation to be paid by a carrier or group of carriers when the Commission finds that exemption is in the national interest.
Revised Interstate Commerce Act, Pub.L. No. 95–473, § 11122(b)(2), 92 Stat. 1337, 1422 (1978) (formerly codified at 49 U.S.C. § 11122(b)(2)).

clusion that the ICC erred in its construction, as they must to prevail. We, therefore, affirm the Commission's construction of subsection 11122(b) as permitting below-cost compensation to car-providing shippers.

Obviously, even given the deference owed the Commission's interpretation, we would not uphold an arbitrary and capricious rejection of LOSAC's complaint against the railroads' allowances. Certainly, the Commission would be required to take appropriate action if the rates were found to be unlawful. However, LOSAC's argument for unlawfulness rests wholly on its interpretation of subsection 11122(b) as requiring full compensation for costs of ownership and as, therefore, requiring all of the annual adjustments provided for under the 1980 agreement. The ICC's rejection of that narrow argument was proper. At some points in its opinion, however, the Commission purports to measure the railroads' allowances against the full range of criteria specified in subsection 11122(b). *See* 4 I.C.C.2d at 11–14. That attempt, as the ICC's vice chairman suggests in his partial dissent, is plainly insufficient. *Id.* at 22. We think the scope of the ICC's decision is correctly assessed in its own Conclusion: "Having rejected the proposition that uniform nationwide allowances should be adopted and must conform to historical ownership costs ... we have fully disposed of the complaint. LOSAC has made no effort to show that specific allowances are unlawful under any standard that takes into account market conditions as they relate to all of the statutory factors." *Id.* at 19–20. On that basis, we affirm the ICC.

### III. Conclusion

For the reasons set forth above, we hold that the petition before us is without merit. Therefore, the decision of the Commission will stand and the petition is denied.