69 F.3d 583
 314 U.S.App.D.C. 419, 64 USLW 2305
 SOUTHERN PACIFIC TRANSPORTATION COMPANY, et al.
v.
INTERSTATE COMMERCE COMMISSION, and the United States of
America, Respondents
Consolidated Rail Corporation, et al., Intervenors.
 Nos. 92-1583, 94-1651.
 United States Court of Appeals,
 District of Columbia Circuit.
Argued Sept. 5, 1995.
Decided Nov. 7, 1995.
Rehearing and Suggestion for Rehearing In Banc Denied Jan.
25, 1996.*
 
 On Petitions for Review of Orders of the Interstate Commerce Commission.
 John G. Roberts, Jr., argued the cause for Southern Pacific Transportation Company, et al. With him on the briefs were George W. Mayo, Jr., David G. Leitch, Louis P. Warchot, II, and Carol A. Harris. Entering appearances were John M. Smith and Fritz R. Kahn for Southern Pacific Transportation Company.
 Louis Mackall, V, Attorney, Interstate Commerce Commission, argued the cause for respondents. With him on the brief were Henri F. Rush, General Counsel, and Craig M. Keats, Associate General Counsel, Interstate Commerce Commission, and John J. Powers, III and John P. Fonte, Attorneys, United States Department of Justice.
 Paul A. Cunningham, argued the cause for intervenors Consolidated Rail Corporation, et al., in support of respondents. With him on the brief were David A. Hirsh, Alice C. Saylor, Constance L. Abrams, Richard E. Weicher, Paul R. Hitchcock, George A. Aspatore, Michael E. Roper, William C. Gibb, and Robert B. Batchelder. Mark L. Evans entered an appearance for intervenor General Electric Railcar Services Corporation.
 On the brief of intervenors in support of Southern Pacific Transportation Company were Jo A. DeRoche for Montana Rail Link, Inc., and Karlheinz Morell for San Luis Central Railroad Company, et al. Laurence H. Gold entered an appearance for intervenor Montana Rail Link, Inc.
 Gordon P. MacDougall was on the brief for intervenor United Transportation Union-Illinois Legislative Board in support of Southern Pacific Transportation Company.
 J. Raymond Clark entered an appearance for intervenor Sandersville Railroad Company. Myles L. Tobin entered an appearance for intervenor Illinois Central Railroad Company. Christopher E. Hagerup entered an appearance for intervenors Interail, Inc., et al.
 Before: WALD, SILBERMAN, and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 Dissenting opinion filed by Circuit Judge ROGERS.
 SILBERMAN, Circuit Judge:
 
 
 1
 Chicago and North Western Railroad (CNW) petitioned for review of the ICC's promulgation of rules concerning rates at which railroads exchange railcars. After CNW moved to withdraw as petitioner on March 20, 1995, intervenors Southern Pacific Transportation Company and its affiliated railroads (SP) moved to substitute as petitioner.[1] Since SP is not a "party aggrieved" under the Hobbs Act, 28 U.S.C. Sec. 2344 (1994), we deny SP's motion to substitute and dismiss the petition.
 
 I.
 
 2
 The petition in this case arises out of the mandatory interchange requirement that has characterized American railroading for nearly a century. Railroads must permit their cars to be used by other carriers to carry freight on other lines, as well as accept the cars of other carriers onto their lines. Mandatory interchange allows freight to travel from point A to point B in one car (obviating the need to move freight between cars) even where no one railroad's lines connect points A and B. See Baltimore & O.C.T.R.R. Co. v. United States, 583 F.2d 678, 681 (3d Cir.1978), cert. denied, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979). The rates at which cars are leased in mandatory interchange have traditionally been set through regulation rather than through the operation of the market.
 
 
 3
 Since 1976, Congress has required the ICC to give consideration to a variety of factors when it prescribes rates, including "current costs of capital, repairs, materials, parts, and labor" as well as "the transportation use of each type of freight car, the national level of ownership of each type of freight car, and other factors that affect the adequacy of the national freight car supply." 49 U.S.C. Sec. 11122(b) (1994). In 1977, the ICC adopted a formula that prescribed car hire rates for a variety of car types. Car Service Compensation--Basic Per Diem Charges--Formula Revision in Accordance with the Railroad Revitalization and Regulatory Reform Act of 1976, 358 I.C.C. 716 (1977).
 
 
 4
 The ICC's approach was a flop. The most troubling defect was its failure to adapt to changing market circumstances. Despite rampant car surpluses in the early 1980s, for example, car hire rates increased--leading to still greater car surpluses. In 1985, the ICC suspended annual updates to the car hire rates, and sought comments on possible solutions to the formula's difficulties. Car Service Compensation--Basic Per Diem Charges (Postponement of the Annual Car-Hire Charge Update for 1983), 1 I.C.C.2d 742 (1985). A coalition of railroad industry participants, in October 1990, submitted a proposed solution to the ICC's car hire woes. The coalition's proposal called for immediate deprescription--setting rates by bilateral negotiation between car owners and car users rather than by ICC formula--for new cars, and gradual deprescription over 10 years for existing cars.
 
 
 5
 The Commission issued two notices of proposed rulemaking, received numerous comments, issued final rules, and then granted two petitions for reconsideration. In the course of the rulemaking, the Commission changed--sometimes reversed--its position on a variety of issues, particularly on the effective date of the definition of new cars and on the applicability of the right of independent action under 49 U.S.C. Sec. 10706.[2] The end result was a program very much like that proposed to the ICC in the first place. Under the program, existing cars remain subject to prescribed rates--fixed at 1990 levels--for 10 years; carriers may deprescribe 10% of their fleets in each of those 10 years. The rates for new cars, defined as cars built after January 1, 1993, are determined by bilateral negotiation and, if necessary, arbitration under a rule adopted as part of the Code of Car Hire Rules.[3] The arbitration is of the final offer selection, or "baseball style," variety, in which the arbitrator must select one of the parties' final offers and may not consider other arbitral awards or other offers for similar cars. Finally, the ICC decided that the right of independent action afforded carriers under 49 U.S.C. Sec. 10706 does not apply to the arbitration rule because the rule "plainly is not one that forces participants to be parties to collectively set rates." Joint Petition for Rulemaking on Railroad Car Hire Compensation, 9 I.C.C.2d 1090, 1102 (1993) (Reconsideration).[4]
 
 
 6
 Over the course of the rulemaking, SP participated twice. After the Commission issued its first notice, SP submitted a comment on the proposed rulemaking stating that it "generally support[ed] the implementation of the Commission's proposed rules and exemption in these proceedings, subject to the important qualification that such proposed rules and exemption be expressly written to afford carriers, car users, and car owners a subsequent opportunity to seek Commission review of the deprescription in the event unforeseen problems develop which undercut the public interest benefits that the Commission would be seeking to achieve through deprescription." Comments of Southern Pacific Transportation Company, et al. at 3 (Mar. 18, 1991) (SP Comments). SP further stated that it "believe[d] that a framework of bilateral agreements is vastly preferable to any system imposed by regulation and [was] generally supportive of the proposed car hire rules and exemption in these proceedings which provide for a phased deprescription of car hire over a 10-year period." Id. at 4. It proposed that the final rules include a section, entitled "Supplemental Review," providing for further ICC review of the deprescription regime should unforeseen difficulties arise.[5] SP acknowledged that "the Commission always retains the right, upon petition or upon its own motion, to reopen or institute a proceeding in appropriate circumstances," but expressed concern lest the "impression be left of the Commission abrogation of participation in the car hire deprescription process." Id. at 6.
 
 
 7
 SP submitted further comments on May 1, 1991. Reiterating its concern that the ICC was venturing into unexplored territory, SP this time conditioned its support for the proposed rules "upon explicit inclusion of a procedure for subsequent Commission review." Reply Comments of Southern Pacific Transportation Company, et al. at 3 (May 1, 1991) (SP Reply Comments). No such provision was included in the ICC's rules.
 
 
 8
 On February 11, 1994, CNW filed a petition for a declaratory order (1) that a carrier could opt out of the Code of Car Hire arbitration rule while remaining a party to the remainder of the Code, and (2) that a carrier not participating in the arbitration rule could set its own rates "subject only to the Commission's regulatory authority under 49 U.S.C. Sec. 11122(b)." In addition to its comments in the rulemaking, SP filed a "Reply in Support of Institution of Declaratory Order Proceeding." It only asserted, however, that the issues were of "industry-wide importance" and that "[t]he time and expense involved in litigation over these issues on a case-by-case basis will be obviated by the Commission's expeditious resolution of the matter in a declaratory order proceeding." SP expressed no opinion on the merits of CNW's petition.
 
 
 9
 The Commission ostensibly denied CNW's request as to the first issue, but stated that the right of independent action did not apply to the arbitration rule, thus settling the matter. The ICC issued a declaratory order as to the second issue that a non-Code participant may set its own rates until a complaint is filed with the ICC. At that time the ICC would set an "interim rate" that would apply until the dispute was resolved.
 
 
 10
 CNW filed a petition for review and SP intervened.
 
 II.
 
 11
 SP, before us, seeks to argue essentially the position that CNW took before the Commission throughout the rulemaking. SP contends that the ICC's adoption of the entire deprescription program was arbitrary and capricious. The Commission is accused of failing to explain adequately its major change in direction; SP claims that the Commission merely yielded to the industry's position. Moreover, the scheme embodied in the rule, according to SP, is simply not consistent with the ICC's statutory authority. The car hire rates that will result, either through the compulsory arbitration for new cars or the frozen 1990 rate prescribed for old cars, do not reflect the factors the ICC is obliged to consider under Sec. 11122.[6] And it is argued that the ICC misread the statute by concluding that the railroads are not entitled to exercise "independent action" by either opting out of the arbitration rule or by rejecting an arbitrator's award.
 
 
 12
 The government, of course, responds to these weighty arguments, but, at the outset, the government challenges SP's standing to raise them. The government opposes SP's motion to substitute for CNW as petitioner, both because as a general matter an intervenor should not be permitted to substitute as a petitioner (after the time for petition has passed), and because SP is not an "aggrieved party" within the meaning of the Hobbs Act and therefore lacks standing as a petitioner.
 
 
 13
 Although the government claims that this court has never permitted an intervenor to substitute for a withdrawing petitioner, we have frequently adverted to the possibility. See Aeronautical Radio, Inc. v. FCC, 983 F.2d 275, 283 (D.C.Cir.1993); Alabama Power Co. v. ICC, 852 F.2d 1361, 1368 (D.C.Cir.1988); Simmons v. ICC, 716 F.2d 40, 46 (D.C.Cir.1983). Numerous other circuit courts have explicitly permitted the practice. See, e.g., Benavidez v. Fong Eu, 34 F.3d 825, 830 (9th Cir.1994) (citing cases); United States Steel Corp. v. EPA, 614 F.2d 843, 845 (3d Cir.1979). Since an intervenor must show standing and may not raise new issues not brought before the court by the petitioner, National Ass'n of Regulatory Utility Comm'rs v. ICC, 41 F.3d 721, 729-30 (D.C.Cir.1994), we see no analytical difficulty in permitting an intervenor to substitute for a petitioner. There remains the question whether SP has standing.
 
 
 14
 SP contends that the phrase "party aggrieved" obliges a petitioner merely to show Article III standing (injury-in-fact, causation, and redressability), and that it participated as a party before the agency. Although it is quite unclear exactly how SP is economically injured by the Commission's actions, since SP, like all other railroads, is on both ends of the car hire transaction, we will assume arguendo that SP satisfies Article III injury. But it must still show that it is "aggrieved" under the statute, Water Transport Ass'n v. ICC, 819 F.2d 1189, 1193-95 (its injury falls within the zone of interests Congress contemplated), and, moreover, under the Hobbs Act it must further show that it is aggrieved as a "party"--not just as a person. Simmons, 716 F.2d at 42; Gage v. AEC, 479 F.2d 1214, 1218 (D.C.Cir.1973). SP acknowledges that, in that regard, its participation before the agency is a necessary condition to satisfying party aggrieved status. Although we have said that de minimis participation is insufficient, Alabama Power, 852 F.2d at 1368; cf. Water Transport Ass'n v. ICC, 819 F.2d 1189, 1192-93 (D.C.Cir.1987), SP's involvement below clears that hurdle--albeit barely.
 
 
 15
 SP argues that, having met these two standards, it is a party aggrieved without regard to whether the agency agreed with or rejected its views. Thus, it does not really matter what stance it takes at the court of appeals; it can change its position 180 degrees from that which it took before the Commission, just as the Commission can change its position between a notice of proposed rulemaking and a final rule. Whatever an agency's latitude in switching its rulemaking position after comments, SP's analogy is misconceived. The appropriate comparison would be to an agency's latitude on appeal. An agency is barred from advancing in a reviewing court even somewhat differing reasoning from that it expressed at the time it took action. SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).
 
 
 16
 It makes little sense to interpret the statute requiring a petitioner to present its view to the agency to qualify as a "party" and then permit the petitioner to disavow those views and take a directly contrary position in the court of appeals. That would hardly serve the interest we perceived Congress intended--that petitioner present its position first to the agency. To be sure, we permit a party that is aggrieved to raise arguments it did not present to the agency but were presented by other parties, see, e.g., Cellnet Communication, Inc. v. FCC, 965 F.2d 1106, 1109 (D.C.Cir.1992) ("Consideration of the issue by the agency at the behest of another party is enough to preserve it."). We have never permitted a petitioner, however, simply to take a position in this court opposite from that which it took below, particularly when its position has prevailed before the agency. Our interpretation of the Hobbs Act is consistent with the "general rule that a party may not appeal from a disposition in its favor." Showtime Networks Inc. v. FCC, 932 F.2d 1, 4 (D.C.Cir.1991). See also Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 176, 54 S.Ct. 658, 668, 78 L.Ed. 1182 (1934). We have frequently applied this general rule to petitions for review of agency actions under the Hobbs Act. See Shell Oil Co. v. FERC, 47 F.3d 1186, 1201 (D.C.Cir.1995); Showtime Networks, 932 F.2d at 4; see also Southern Natural Gas Co. v. FERC, 877 F.2d 1066, 1071 (D.C.Cir.1989) (holding party that received its first choice but that sought review of agency failure to give party its second choice not to be party "aggrieved" under Natural Gas Act Sec. 19(b), 15 U.S.C. Sec. 717r(b) (1988)); National Ass'n of Cas. & Sur. Agents v. Board of Governors of Federal Reserve Sys., 856 F.2d 282, 284 n. 1 (D.C.Cir.1988) (where party "received what it requested--approval of its application--it is not a party aggrieved" under 12 U.S.C. Sec. 1848 (1982)), cert. denied, 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989). Thus, we reject SP's bold argument that it can qualify as a party aggrieved without regard to the position it took before the Commission.
 
 
 17
 Alternatively, SP argues that it did not gain satisfaction from the ICC; in important respects--at least important enough to qualify as a party aggrieved--it was rebuffed by the Commission. SP points out that its support of the deprescription program was conditioned on the Commission specifically providing for an ongoing review of the deprescription program, yet the Commission did not include such a provision in the final rule. We agree in principle that if a party conditionally supports a proposed rule before the Commission and the condition is not satisfied that party would be aggrieved. Moreover, it is up to the party, not us, to determine how important a particular condition is to that party. Nevertheless, if the party cannot even explain to us the significance of the supposed condition, we think it can be disregarded. Surely it could not be contended that SP was aggrieved, for instance, if in its comments it had conditioned its support on the Commission promulgating the proposed rule on a holiday--to emphasize its festive nature.
 
 
 18
 In this regard, SP asked that the Commission include in the rule a provision that the ICC "may at any time review whether (a) continuation of the application of prescribed rates to fixed rate cars or (b) prescription of rates for market rate cars may need to be revised, modified, or otherwise changed in the public interest, either upon its own motion or upon the petition of any interested party for good cause shown." SP Comments at 6 (emphasis added). But in the very comment in which SP proposed this provision, SP conceded that the ICC already had the authority to review the deprescription program on the motion of others or on its own motion. Indeed, it is arguable that the doubly precatory admonition contained in SP's proposed language ("the ICC ... may review whether [the program] may need to be revised") would give SP less assurance of continued oversight than would existing law. See 5 U.S.C. Sec. 553(e) (1994) ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."); 5 U.S.C. Sec. 555(e) (1994) ("Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding.... [T]he notice shall be accompanied by a brief statement of the grounds for denial."). And, SP's claim at oral argument that the "Supplemental Review" provision would somehow allow for swifter changes to the deprescription program runs headlong into the Administrative Procedure Act, which requires notice and comment before rulemaking. 5 U.S.C. Sec. 553(a)-(d) (1994).[7]
 
 
 19
 We are therefore satisfied that, with the ICC's repeated assertions that it would keep a close eye on the deprescription program, and that it was ready and willing to respond to complaints about the operation of the program, SP received the assurances that it sought. See Reconsideration at 1096; Final Rules at 87. Indeed, if the ICC's regulatory journey (described by SP--aptly--as peripatetic) demonstrates anything, it should demonstrate the ICC's willingness to rethink and alter aspects of the program in response to the entreaties of affected industry participants. An expression of this willingness is what SP sought, see SP Comments at 6 (expressing concern lest the "impression be left of the Commission abrogation of participation in the car hire deprescription process"), and that is what it got.
 
 
 20
 We similarly do not believe that SP became a "party aggrieved" by virtue of its support for the ICC's resolution of CNW's motion for declaratory orders. In its filing, SP took no position on the merits of CNW's motion. SP simply indicated its belief that ICC action would provide desirable clarification and asked that the ICC take that action. The Commission denied one motion for a declaratory order and granted the other in part. The action was taken, and the clarification sought was provided.
 
 
 21
 * * *
 
 
 22
 Accordingly, SP is not a "party aggrieved." We therefore deny its motion to substitute as petitioner and dismiss the petition.
 
 ROGERS, Circuit Judge, dissenting:
 
 23
 The court decides that intervenor Southern Pacific Transportation Company ("SP") is not a "party aggrieved" under the Hobbs Act, 28 U.S.C. Secs. 2341-2351 (1988 & Supp. V 1993), on the ground that SP may not take a position in this court opposite from that which it took before the Interstate Commerce Commission. Majority opinion at 430. Were this the situation, I might agree. However, during the notice-and-comment proceedings the Commission changed and even reversed itself on various positions, and SP never embraced the industry-group's deprescription scheme and at most conditionally supported portions of the Commission's deprescription rules because of concerns about price and economic dislocation. Under these circumstances SP should not be barred from petitioning the court to vacate the Commission's car-hire rate deprescription rules on grounds presented to the Commission by another party, which has since withdrawn its petition for review by the court. In denying SP this opportunity for judicial review, the court forces future litigants to unduly encumber administrative notice-and-comment proceedings without apparent offsetting benefit. Because the result reached by the court is dictated by neither the Hobbs Act nor this court's precedent, I respectfully dissent. On the merits of SP's substantive challenges to the deprescription rules, I would grant its petition.
 
 I.
 
 24
 The Hobbs Act provides that "[a]ny party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. Sec. 2344 (1988). Under this court's precedent, SP has satisfied the jurisdictional requirements for it to seek judicial review under the Hobbs Act of the Commission's final rules.[1]
 
 
 25
 First, SP was a "party" to the Commission's car-hire rate deprescription proceedings. As interpreted by this court, section 2344 requires that petitioners have been "parties" to the agency proceeding leading to the issuance of the agency's order. See Simmons v. ICC, 716 F.2d 40, 42 (D.C.Cir.1983); Gage v. AEC, 479 F.2d 1214, 1218 (D.C.Cir.1973). For judicial review of a rulemaking, a petitioner must itself have submitted comments to the agency on the proposed rule. See Alabama Power Co. v. ICC, 852 F.2d 1361, 1368 (D.C.Cir.1988). The deprescription rules were developed in notice-and-comment proceedings, during which the Commission issued several decisions incorporating different proposals and finally settled on the rules that SP seeks to have this court set aside. SP submitted comments on its general reservations regarding the industry-group proposal and specifically on Commission oversight of the deprescription regime and on initiation of declaratory-order proceedings. SP thus presented its own views, joined in support of positions presented by others in opposition to particulars of the rules, and now seeks to raise issues that the Commission addressed in response to arguments presented by the original petitioner, Chicago and North Western Railway Company ("CNW") (formerly known as Chicago and North Western Transportation Company).
 
 
 26
 Second, SP falls within the well-recognized exception to the exhaustion requirement when another party has raised the arguments at issue before the agency. See Cellnet Communication, Inc. v. FCC, 965 F.2d 1106, 1109 (D.C.Cir.1992); Natural Resources Defense Council, Inc. v. EPA, 824 F.2d 1146, 1151 (D.C.Cir.1987) (in banc). Even when a statute expressly requires exhaustion, this court has not required the petitioner itself to have raised the argument. For example, in Blount v. SEC, 61 F.3d 938 (D.C.Cir.1995), the court held that a statute requiring that a petitioner for review be "aggrieved" and that the objections have been "urged before the Commission," 15 U.S.C. Sec. 78y(a)(1), (c)(1) (1994), "shows no interest in who urged the objection, and is presumably aimed only at assuring that the Commission have had a chance to address claims before being challenged on them in court." Id. at 940; see also American Scholastic TV Programming Found. v. FCC, 46 F.3d 1173, 1177-78 (D.C.Cir.1995) (Hobbs Act case).
 
 
 27
 Third, SP has taken timely steps to protect its interests by moving to intervene after CNW filed its petition for review of the Commission's final rule. As intervenor, SP was in support of CNW's petition to overturn the deprescription rules from the outset, and it had all the rights of a petitioner. See Schneider v. Dumbarton Developers, Inc., 767 F.2d 1007, 1017 (D.C.Cir.1985). When CNW moved to withdraw its petition as a result of its being acquired by a pro-deprescription company, Union Pacific Corporation, CNW stated that granting its motion would "not prejudice any other parties, because there are intervenors supporting CNW's position which can be substituted for CNW as a petitioner." The court properly rejects the Commission's argument that an intervenor like SP cannot substitute as a petitioner, majority opinion at 8, because the ability to continue the litigation after an original party withdraws is part of the intervenor's status as a party. See Benavidez v. Eu, 34 F.3d 825, 830 (9th Cir.1994).
 
 
 28
 Fourth, the court properly assumes that SP has Article III standing. Op. at 423-424. See National Treasury Employees Union v. United States Merit Sys. Protection Bd., 743 F.2d 895, 910 (D.C.Cir.1984) (standing requirements). SP asserts injury for two reasons. First, SP claims that it suffers economic injury because the new deprescription rule, which SP maintains the Commission developed without properly considering the factors set forth in 49 U.S.C. Sec. 11122(b) (1988), fails to ensure that car owners receive a fair return on their investments and that car users are not forced to pay excessive rates. As SP is both a provider and purchaser of railroad cars, it operates on both sides of the car-hire transactions affected by the Commission's new deprescription scheme. Second, SP claims injury from the Commission's determination that carriers cannot exercise their statutory right to take independent action from the arbitration system.
 
 
 29
 Despite the fact that SP has complied with all these jurisdictional requirements, the court concludes that SP is not a "party aggrieved." Op. at 424. Previously, this court had held that the word "aggrieved" in the Hobbs Act was synonymous with traditional Article III standing concerns. See Water Transport Ass'n v. ICC, 819 F.2d 1189, 1193 (D.C.Cir.1987); B.J. McAdams, Inc. v. ICC, 698 F.2d 498, 500 n. 5 (D.C.Cir.1983); Cross-Sound Ferry Servs., Inc. v. ICC, 934 F.2d 327, 336 (D.C.Cir.1991) (Thomas, J., concurring). Nevertheless, the effect of the court's holding here is that a party in a rulemaking proceeding may not challenge an agency rule by raising issues before the court that it did not raise as a commentator before the agency, at least not when it supported the agency's general approach if not all its particulars.[2] In the court's view, "[i]t makes little sense to interpret the statute requiring a petitioner to present its views to the agency to qualify as a 'party' and then permit the petitioner to disavow those views and take a directly contrary position in the court of appeals."[3] Op. at 424. Because the Commission wavered so much in its decision-making and because SP's support of deprescription was always tenuous at best and expressly conditional, however, SP has not staked out a position contrary to that which it seeks to present on appeal.
 
 
 30
 As the Commission's various formulations of deprescription make clear, support of the general approach of deprescription is different from endorsement of a particular formulation. The Commission was reviewing an industry-group proposal to overhaul the car-hire rate system that had been in existence since 1977. In the course of considering comments on the proposal, the Commission changed its position on several discrete issues, swinging back and forth, for example, on both retroactivity and the right of independent action. Although the old formula approach had not produced the intended results, in a market with mandatory interchange, see 49 U.S.C. Sec. 10742 (1988), the Commission could not be certain about the "market" results under deprescription.
 
 
 31
 Moreover, in its brief, the Commission acknowledges both that its rules are "very different" from a proposal it considered in 1985 and that SP had made known to the Commission that SP's view of deprescription was not that adopted in the Commission's rules. Brief for Respondents at 10, 18 n. 13. When the Commission in 1985 first concluded that its formula approach was faulty, see Car Service Compensation--Basic Per Diem Charges, 1 I.C.C.2d 742 (1985) ("Postponement of Rate Update"), SP urged a complete deregulation of car-hire rates, including the abolition of mandatory interchange. As a second-best alternative, SP indicated that it was willing to accept deprescription, somewhat along the lines of the rules that were eventually adopted. But SP emphasized, then and later, that, whether an arbitrator or the Commission determined disputed rates under deprescription, "the decision maker should be required to consider all relevant cost and market factors in establishing a car-hire rate." The following year, in 1986, SP joined in support of a deprescription proposal that avoided the problems of dispute resolution: for the "mandatory haul" (the requirement to receive a loaded freight car), the receiver would have the right to set the price; for any additional use of the car, the owner would have the right to set the rate. Despite its general approval of deprescription in 1985 and 1986, then, SP envisioned different deprescription schemes from that under review in the instant appeal.
 
 
 32
 Nor can SP be said to disavow views it took before the Commission. SP's initial comments on March 18, 1991, on the industry-group proposal were cautious, acknowledging that "necessary efficiencies and economies in rail transportation ... can only occur if regulatory constraints are diminished" but expressing concern about avoiding "any significant transportation marketplace dislocations." Although it considered "a framework of bilateral agreements [as] vastly preferable to any system imposed by regulation and [was] generally supportive of the proposed car hire rules and exemption," SP noted that, notwithstanding claims by proponents that deprescription would achieve a number of public interest objectives, "there may be serious unforeseen problems from a practical standpoint." Consequently, SP wanted the Commission to make clear that it was not abrogating its statutory authority, see infra Parts II B & C, by incorporating into the new rules a procedure for obtaining further Commission review. In additional comments on the industry-group proposal on May 1, 1991, SP repeated its view of the need for an explicit Commission review procedure. SP pointed out that the proposed rules would provide only for Commission review of allegations of abuse of the car-hire dispute-resolution process "and would not provide for review of more fundamental problems that could develop with the deprescription itself." SP reasserted its position that there should be a vehicle incorporated into the rules themselves for obtaining review of the entire deprescription process if, for example, the Commission's economic assumptions proved incorrect or unforeseen serious problems caused economic dislocation to a particular segment of the industry. In a petition for reconsideration of the Commission's Final Decision, SP also joined in comments submitted by the Coalition of Rail Carriers and Leasing Companies pointing to various concerns with the Commission's decision as it stood at that point.
 
 
 33
 SP thereafter also joined "in support of" CNW's institution of the declaratory-order proceeding on a railroad's right to take independent action in opting out of the Code of Car Hire Rules and promulgating its own default rates. CNW's petition to the Commission explained that, while it was preserving its appeal to this court seeking reversal of the Commission's deprescription decisions, it requested the Commission's clarification of "a major controversy" that had arisen between CNW and the principal proponents of deprescription. SP, in supporting CNW's petition, noted that the legal issues "are potentially applicable to all carriers and, therefore, are of industry-wide importance." Commission resolution would obviate the time and expense of litigation and facilitate implementation of the final rules on car-hire deprescription.
 
 
 34
 The court suggests that aggrievement under the Hobbs Act turns on the court's assessment of the significance of a party's position before the Commission. Op. at 424-425. In SP's view (in its March 19, 1991, comments), under deprescription "[t]he rail industry will be entering uncharted waters.... As with any new venture, there are bound to be uncertainties and, in view of the severe impact that any misstep might have, the Commission should be readily available to monitor, assess and fine-tune, if necessary, the system to reflect the smooth integration of market-sensitivity, recognition of carrier investment, and the needs of the shippers in connection with the car hire process." On its face, this statement reflects that the close monitoring that SP sought entails a different kind of Commission involvement than occurs in the process of filing a new docket seeking after-the-fact review by the Commission. See 49 C.F.R. Sec. 1110.2 (1994).[4] In the context of these proceedings--in which the Commission was responding to an industry-group proposal scrapping the old formula for direct Commission prescription of car-hire rates,[5] and in which the Commission stated a preference for letting "market" forces control--informal agency assurances that it will respond to complaints, Op. at 425, do not fully satisfy SP's request for more than routine Commission review. Indeed, the court implicitly acknowledges that SP's request cannot be rejected as frivolous. Op. at 424.
 
 
 35
 Moreover, the court stretches to find that SP has received everything that it requested from the Commission and hence is not "aggrieved." Op. at 424-425. The court seems convinced that, in filing "in support of" CNW's request for a declaratory order, SP was merely asking the Commission to clarify the respective rights and obligations of railroad carriers and was not taking a position on the merits of CNW's request. On the other hand, as the Commission noted, railroads submitted comments in support of or against CNW's petition for a declaratory order based on their position toward the underlying deprescription regime. Chicago and North Western Transp. Co. Petition for Declaratory Order--Right of Independent Action as to Car Hire Rates and Rules, 1994 WL 495048, at * 1 n. 5 (Sep. 2, 1994) ("Declaratory Order Petition"). The Commission denied CNW's request for a declaration that it could opt out of the arbitration provision while remaining part of the Code of Car Hire Rules on the ground that it had already decided the issue in the rulemaking. Id. at * 2. If the Commission had agreed with SP that the issue of the right of independent action remained an open question, it might have invited comments on the matter, as CNW had requested. In that event, SP informed the Commission on March 4, 1994, that it "intend[ed] to participate in the proceeding." This degree of participation should be sufficient to conclude that SP informed the Commission that it disagreed with the Commission's views on a carrier's right of independent action.
 
 
 36
 In sum, during the notice-and-comment proceedings, SP never embraced either the industry-group proposal for deprescription or the Commission's rules without condition, instead preserving its unmet concerns about price and economic dislocation while others presented specific objections to the several Commission formulations of the deprescription rules. Having failed to obtain either the close Commission monitoring or the right of independent action that it sought as part of deprescription, SP seeks vacation of the rules adopted by the Commission. Foreclosing SP's review means that the deprescription rules escape judicial review because SP did not file separate comments duplicating those presented by other parties before the Commission. It is unclear what interests are advanced by thus encumbering the free-flowing consultative notice-and-comment process, see Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 (D.C.Cir.1977) (per curiam), and setting a trap for the unwary.
 
 
 37
 Because I conclude that SP is a "party aggrieved" under the Hobbs Act, I turn to the merits of SP's petition.
 
 II.
 
 38
 SP presents three principal challenges to the car-hire deprescription rules: first, the Commission failed to provide a reasoned explanation for its departure from the formula approach and did not address CNW's proposal that the formula be altered rather than scrapped; second, the new deprescription rules fail to conform to the requirements of 49 U.S.C. Sec. 11122(b) (1988); and third, the Commission's ruling that carriers do not have a right of independent action from the arbitration procedures or the rates contravenes 49 U.S.C. Sec. 10706(d)(2)(C) (1988) and the Administrative Dispute Resolution Act, 5 U.S.C. Sec. 575(a)(3) (1994). Because the second challenge has merit and the third raises questions requiring further Commission explanation, I would grant the petition and remand the proceedings to the Commission.
 
 
 39
 The Commission's deprescription rules can be summarized as follows. Existing freight cars (those placed in service or rebuilt before January 1, 1993, or ordered before July 1, 1992) are classified as "fixed rate" cars. 49 C.F.R. Sec. 1033.1(a)(3) (1994). Fixed-rate cars continue to be governed by the Commission's prescribed rates, which are frozen at the December 31, 1990, levels for ten years. Id. Sec. 1033.1(b)(1). Newly acquired freight cars are referred to as "market rate" cars. Id. Sec. 1033.1(a)(4). Carriers are free to enter into bilateral agreements as to the rates for market-rate cars. AAR Arbitration Rule on Railroad Car Hire Compensation as Approved Under 49 U.S.C. Sec. 10706, at p B ("AAR Arbitration Rule"). If the interchanging carriers cannot agree on a rate, and both carriers subscribe to the Code of Car Hire Rules, then the dispute is settled by an arbitrator from the American Arbitration Association. 49 C.F.R. Sec. 1033.1(c)(2)(ii); AAR Arbitration Rule p C. In selecting a rate, the arbitrator is instructed to select "the best and final offer that is closer to the fair market rental value of the cars at issue." AAR Arbitration Rule p C(5)(d). Until a dispute is settled, a "default rate" applies, which is generally "the rate last in effect." Id. p B(3). Each carrier may annually convert up to ten percent of its fixed-rate cars into market-rate cars; after ten years all the cars are governed by "market rates." 49 C.F.R. Sec. 1033.1(b)(3). Although the Commission held out deprescription as a "market-oriented approach," Review of Car Hire Regulation, 1992 WL 40708, at * 1 (Feb. 18, 1992) ("Second Notice of Proposed Rulemaking"), the rules essentially replaced Commission prescription of car-hire rates with resolution of rate disputes through private arbitration.
 
 A.
 
 40
 Reasoned decision-making. When an agency changes course, the court must ensure that "prior policies are being deliberately changed, not casually ignored," and that the agency "has articulated permissible reasons for that change." Clinton Memorial Hosp. v. Shalala, 10 F.3d 854, 859 (D.C.Cir.1993) (citations and quotation marks omitted). The ultimate question, however, is whether the court can discern the agency's path, based on the record and not on post hoc justifications. Id. The Commission's explanation is at times somewhat terse. Apparently, in light of congressional impetus, the Commission concluded that the merits of a "market"-based approach were largely self-evident. Nevertheless, although the Commission is obligated to consider alternatives presented to it, the reasoning underlying the Commission's decision to abandon the formula is discernible from its actions in addressing the dysfunctional formula.
 
 
 41
 In a series of decisions, the Commission moved away from strict application of the formula approach as it became clear that the formula was exacerbating a freight-car surplus. In February 1992, the Commission pointed to the serious problem with the formula, which had failed over the years "to adjust rationally to changes in the supply and demand for cars." Second Notice of Proposed Rulemaking, 1992 WL 40708, at * 1. The Commission therefore discontinued its 1985 proceeding considering revisions to the formula, concluding that it was time to depart from that approach. Id. at * 11. Since 1985, the Commission has frozen rate updates for changes in the cost components of the formula, see Postponement of Rate Update, 1 I.C.C.2d at 745-53, and in 1991 it approved a system permitting bilateral agreements above or below the prescribed rate. See Joint Petition for Rulemaking on Railroad Car Hire Compensation, 8 I.C.C.2d 222 (1991). SP does not challenge those decisions, and yet it is in those decisions that the Commission set forth the reasoning that underlies its adoption of deprescription. See id. at 225-26 & n. 8; Postponement of Rate Update, 1 I.C.C.2d at 750-51.
 
 
 42
 Under the circumstances the court is not left in the dark about the reasons for the agency action. Cf. United Transp. Union--Ill. Legislative Bd. v. ICC, 52 F.3d 1074, 1079 (D.C.Cir.1995). The Commission's reasoning in its earlier decisions makes clear that the deprescription rules are simply another step in a path set by the Commission's earlier actions. See Western Coal Traffic League v. ICC, 735 F.2d 1408, 1411 (D.C.Cir.1984). Even though the earlier actions did not dictate adoption of the deprescription rules, they did provide an adequate explanation of the deficiencies in the old formula approach and of why the Commission was reluctant to continue on that path when Congress had called on the Commission to emphasize a market approach. See 49 U.S.C. Sec. 10101a (1988). Moreover, in dismissing CNW's alternative proposal to modify the old formula, the Commission observed that the industry-group proposal embodied "a market-oriented approach," Second Notice of Proposed Rulemaking 1992 WL 40708, at * 11, while CNW's approach "was designed to improve only one component of the old formula, known as the car day divisor." Joint Petition for Rulemaking on Railroad Car Hire Compensation, 9 I.C.C.2d 1090, 1095 n. 10 (1993) ("Reconsideration"). Thus, the Commission's reasoning in abandoning prescribed rates is discernible from the record.
 
 B.
 
 43
 49 U.S.C. Sec. 11122. Far more troubling is SP's contention that the Commission's car-hire rules do not comport with 49 U.S.C. Sec. 11122 (1988).[6] This court has made clear that "section 11122 presents a distinct statutory provision with specific requirements that the Commission must satisfy when it chooses to impose a new regulatory format over the car hire relationship." Brae Corp. v. United States, 740 F.2d 1023, 1059 (D.C.Cir.1984) (per curiam), cert. denied, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). Specifically, the Commission must take into account the factors in subsection (b) of Sec. 11122 in setting rates. LO Shippers Action Comm. v. ICC, 857 F.2d 802, 806-07 (D.C.Cir.1988) (LOSAC ), cert. denied, 490 U.S. 1089, 109 S.Ct. 2429, 104 L.Ed.2d 986 (1989). Because there is no conclusive evidence of congressional intent regarding the relative weight to be accorded to the cost factors listed in the first sentence of Sec. 11122(b) and the market factors in the second sentence, the court will uphold a reasonable interpretation that reads the two sentences together. Id. at 807; see also Consolidated Rail Corp. v. United States, 619 F.2d 988, 996 (3d Cir.1980) (Conrail ). So viewed, the Commission's adoption of a system whereby the rates for market-rate cars are determined by an arbitrator based on one of the parties' "last best offer" does not comport with the statute.
 
 
 44
 Market-rate Cars. The deprescription rules provide that "[t]he Commission shall not prescribe car hire for market rate cars." 49 C.F.R. Sec. 1033.1(c)(2)(i). As a result, the Commission contends that Sec. 11122(b) is inapplicable to the setting of rates for market rate cars. Yet the following subsection of the rules provides that "[t]he Code of Car Hire Rules referenced in the Association of American Railroads Car Service and Car Hire Agreement provides that owners and users [which are a] party to that agreement shall resolve car hire disputes thereunder." Id. Sec. 1033.1(c)(2)(ii). This subsection suggests that the Commission continues to regulate car-hire rates, as indeed the Commission has acknowledged in stating that "we are not deregulating car hire compensation, but merely deprescribing it. Sec. 11122 still applies." Joint Petition for Rulemaking on Railroad Car Hire Compensation, 9 I.C.C.2d 80, 91 (1992) ("Final Rules "). SP is correct in arguing that market rates "are regulated rates within the meaning of the Interstate Commerce Act because they are prescribed by an arbitrator acting under Commission authority." Brief for Petitioners at 35. The Commission approved the arbitration amendments to the Car Hire Rules, expressly referred to them in the new rules, and also made clear that it was conditioning the new rules on industry adoption of the new arbitration procedures. Second Notice of Proposed Rulemaking, 1992 WL 40708, at * 3 n. 10. Thus, the Commission's claim that the Sec. 11122(b) factors are inapplicable because it is not prescribing rates under Sec. 11122(a) has an air of unreality.
 
 
 45
 The Commission does not explain how the arbitrator's award will accommodate the statutory factors. Under the deprescription rules, the only standard set for the arbitrator is not that a rate satisfy Sec. 11122 but that:
 
 
 46
 The arbitrator shall select the best and final offer that is closer to the fair market rental value of the cars at issue as determined on the basis for evidence of comparable arm's-length transactions involving any combination of railroads, shippers or other parties. The term "fair market rental value" shall not be interpreted to favor the economic interests of either car owners or car users and is intended to reflect value to both car owners and car users.
 
 
 47
 AAR Arbitration Rule p C(5)(d). The Commission observes that, "[t]o the extent that bilateral agreements eventually become the norm, and arbitrated or adjudicated rates the exception, this program will carry out the Rail Transportation Policy [49 U.S.C. Sec. 10101a] which emphasizes allowing competition to set rates to the maximum extent possible so as to minimize federal regulatory control." Final Rules, 9 I.C.C.2d at 92. Still, the Commission does not explain how the "fair market rental value" standard of arbitrated rates takes into account the Sec. 11122(b) factors: (1) current costs of capital, repairs, materials, parts and labor; (2) the transportation use of each type of freight car; (3) the national level of ownership of each type of freight car; or (4) other factors that affect the adequacy of the national freight car supply.
 
 
 48
 As SP notes, the arbitrator is precluded from making his or her own finding of market value, and is limited instead to choosing between the offers of the parties. The arbitrator may not even consider prior arbitral awards or offers that carriers have made for similar cars. AAR Arbitration Rule p C(5)(e). SP posits the likelihood of uncoordinated ratemaking with results "far removed from anything a true 'market' would produce." Brief for Petitioners at 37. Notwithstanding Congress' encouragement of reliance on market forces in the Staggers Rail Act of 1980, see 49 U.S.C. Sec. 10101a, that statute was a compromise between regulation and deregulation because "Congress recognized that ... full deregulation of the industry was unjustified by industry conditions." Coal Exporters Ass'n v. United States, 745 F.2d 76, 81 (D.C.Cir.1984), cert. denied, 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985). The Commission remained bound to consider all the statutory factors in Sec. 11122(b) in adopting the deprescription rules. LOSAC, 857 F.2d at 807; Conrail, 619 F.2d at 996. Because arbitrated rates for market-rate cars under the deprescription rules fail to take these statutory factors into account, they do not comply with Sec. 11122.
 
 
 49
 Fixed-rate Cars. SP also contends that the prescribed rates for fixed-rate cars, which are frozen at the level of December 31, 1990, fail to reflect "current" costs as required by Sec. 11122(b). But here the Commission's position is more defensible. The freeze had been in effect since 1985, and the Commission had substantial evidence that its existing formula was overcompensating, as reflected in the proceedings that accompanied the 1985 suspension of car-rate updates. See Postponement of Rate Update, 1 I.C.C.2d at 746-51. As the Commission points out, the fixed rate carries over the prescribed rate under the previous formula, which had considered all of the statutory factors. Intervenors in support of the rules suggest that the freeze on depreciation was intended to balance out the suspension of cost updates. Moreover, the Commission indicated that it was not "irrevocably prescribing a single level of rates that w[ould] apply for the next ten years." Final Rules, 9 I.C.C.2d at 1095. SP also has not shown that it is undercompensated under the fixed rate. Cf. Conrail, 619 F.2d at 996.
 
 C.
 
 50
 Finally, in No. 94-1651, SP contends that the arbitration provisions of the deprescription rules violate the right to independent action under 49 U.S.C. Sec. 10706(d)(2)(C) and under the Administrative Dispute Resolution Act, 5 U.S.C. Secs. 571-583.
 
 
 51
 Section 10706. The Commission, by approving agreements between two or more carriers that might otherwise violate the antitrust laws, can immunize the agreements from antitrust liability. Under subsection (a)(2)(A), the Commission may approve any such agreement:
 
 
 52
 that relates to rates (including charges between rail carriers and compensation paid or received for the use of equipment), classifications, division, or rules related to them, or procedures for joint consideration, initiation, publication or establishment of them.
 
 
 53
 But the Commission is charged with ensuring that any agreement that it approves provides a right of independent action to each carrier who is a party to the agreement. Subsection (d)(2)(C) prohibits Commission approval of any agreement:
 
 
 54
 establishing a procedure for determination of a matter through joint consideration unless the Commission finds that each party to the agreement has the absolute right under it to take independent action before or after a determination is made under that procedure.
 
 
 55
 Hence, the right of independent action applies in the instant case if, under the amendment to the Code of Car Hire Rules, carriers have established a "procedure for joint consideration" of car-hire "rates" or of "rules related to them."[7]
 
 
 56
 Congress "has not defined" the right of independent action, and one circuit has observed that "[t]he Commission appears to have a similar difficulty defining independent action." Green Bay & W. R.R. v. United States, 644 F.2d 1217, 1225 (7th Cir.1981). We do know that the purpose of Sec. 10706[8] "was 'to bring about an accommodation' of the antitrust and national transportation policies." Atchison, T. & S.F. Ry. v. United States, 597 F.2d 593, 594 (7th Cir.1979). The right of independent action embodies antitrust principles by guaranteeing that each carrier can freely depart from the agreed-upon rates or procedures. This right to depart undermines the coercive effect of a potential price-fixing conspiracy. See H.R.REP. NO. 1100, 80th Cong., 1st Sess. 15 (1947), reprinted in 1948 U.S.C.C.A.N. 1844, 1858. To safeguard this right of independent action, the Commission has held that the statute protects not only against "barriers to the actual exercise of the right," but also against "procedures or practices which inhibit by indirect means ... the exercise of the right." Notification of Rate Proposals Following Prior Independent Action, 359 I.C.C. 877, 891 (1978).[9] Although the precise contours of the right to independent action under Sec. 10706 remain diffuse, for purposes of this appeal the nature of the right is sufficiently clear.
 
 
 57
 SP contends that joint consideration has occurred on two levels, as to each of which there is a right of independent action: the signatory carriers jointly adopted the arbitration amendment to the Code of Car Hire Rules, and the specific carriers in a particular dispute jointly decide to invoke the arbitrator's authority to set rates. The Code of Car Hire Rules is a private agreement adopted by the Association of American Railroads (AAR) to govern mandatory interchange of freight cars. SP maintains that when the members of the AAR decided to approve the arbitration provision and add it to the Code, they engaged in "joint consideration" of a "rule related to" "rates." Thus, SP asserts that its statutory right to independent action permits it to disregard the arbitration provision, even while SP remains a member of the Car Hire Code. The Commission, on reconsideration, held that the right of independent action applies only in cases of "collective ratemaking or any other form of price fixing," id. at 1103, but not to an agreement to "negotiate ... rates independently or go to arbitration." Id. at 1102.
 
 
 58
 Although the court must defer to the Commission's reasonable interpretation of the statute, Detroit/Wayne County Port Auth. v. ICC, 59 F.3d 1314, 1315-16 (D.C.Cir.1995), the Commission's explanation that "the agreement forecloses participants from acting collectively in setting their rates," Reconsideration, 9 I.C.C.2d at 1102, misses the mark. The language of the statute does not require joint consideration of a rate; rather, as the Commission had earlier acknowledged, Final Rules, 9 I.C.C.2d at 89, the statutory right of independent action is triggered whenever carriers jointly agree upon a rule related to a rate. If the danger that Congress sought to avert was "collective ratemaking or any other form of price fixing," Reconsideration, 9 I.C.C.2d at 1103, then the Commission has not explained why the arbitration provision might not be a disguised form of price-fixing. Ever since the Supreme Court's first Sherman Act case, United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897), inter-railroad agreements have had the potential to be facilitating practices for price-fixing. Given that the Car Hire Code itself "has long been subject to Commission approval," Reconsideration, 9 I.C.C.2d at 1101, the Commission nowhere explained how the arbitration provision "ha[s] no antitrust implications." Id. As one of the signatories to the Car Hire Code, SP has made a strong argument that it retains the right to act contrary to the members' joint decision to set car-hire rates through arbitration.
 
 
 59
 The Commission's decision that the application of the arbitration provision in a particular dispute is not "joint consideration" is equally problematic. Reconsideration, 9 I.C.C.2d at 1103; Second Notice of Proposed Rulemaking, 1992 WL 40708, at * 9. Although the rate that the arbitrator selects is not in itself "jointly" set by the carriers, SP maintains that the arbitrator's authority to prescribe the rate arises from the carriers' joint decision to invoke the arbitration procedures to settle their dispute. SP therefore asserts that its right of independent action allows it to refuse to comply with a rate determined through the arbitration procedure.
 
 
 60
 While the right of independent action as to the second-level decision (the decision to invoke arbitration) would render binding arbitration futile, that is not so for the first-level decision (the decision to add the arbitration provision to the Car Hire Code). The record hardly suggests that it would be impracticable for a particular carrier to remain subject to the other provisions in the Code while declaring that it will not be bound by the arbitration. The Commission concluded that objecting carriers could always opt out of the entire Code of Car Hire Rules, Declaratory Order Petition, 1994 WL 495048, at * 2, but it did not explain why the lesser course of opting out of the arbitration procedure alone should be unavailable.
 
 
 61
 On remand, the Commission should explain more fully why the right of independent action under Sec. 10706(d)(2)(C) does not permit SP to opt out of the arbitration provision in the Code of Car Hire Rules or to decline to participate in arbitration procedures in a specific dispute. Cf. Green Bay & W. R.R., 644 F.2d at 1229.
 
 
 62
 Administrative Dispute Resolution Act. The Administrative Dispute Resolution Act (ADRA) provides that "[a]n agency may not require any person to consent to arbitration as a condition of entering into a contract or obtaining a benefit." 5 U.S.C. Sec. 575(a)(3). SP objects that, under deprescription, participating in the AAR's Code of Car Hire Rules is a "benefit" that it can obtain only by consenting to arbitration.[10] At one time the Commission agreed:
 
 
 63
 The Arbitration Rule and the regulations as proposed do not provide carriers with a real choice. A carrier not participating in the Code of Car Hire Rules might have serious difficulties arranging for interline movement of cars since those rules encompass all the necessary details--including proper UMLER [Universal Machine Language Equipment Register] listing--surrounding accrual, payment, and accounting for car hire. A carrier not agreeing to arbitration must have a real opportunity to carry on its business.
 
 
 64
 Second Notice of Proposed Rulemaking, 1992 WL 40708, at * 6. In its final decision, the Commission undertook to "ensure" that no carrier who withdrew from the Code would be disadvantaged. Final Rules, 9 I.C.C.2d at 87. In view of the Commission's previous reasoning, the Commission has not provided a satisfactory explanation of why membership in the Code is not a "benefit." Industry-wide membership appears to be an indicium of the benefits of belonging to the Code.
 
 
 65
 Accordingly, because Southern Pacific is a "party aggrieved" under the Hobbs Act, the court has jurisdiction and I would grant Southern Pacific's petition for review and remand the rulemaking and the declaratory-order proceedings to the Commission with instructions to consider the factors in Sec. 11122 and the right of independent action under Sec. 10706.
 
 
 
 *
 Circuit Judges Buckley and Tatel did not participate in the order for Rehearing In Banc; Circuit Judge Rogers would grant the petition for Rehearing
 
 
 [1]
 CNW moved to withdraw from this case after Union Pacific Corporation, which supports the ICC in this matter, acquired all outstanding shares of CNW stock and merged CNW into Union Pacific. On May 1, 1995, we granted CNW's motion to withdraw
 
 
 [2]
 Vice Chairman McDonald, joined by Commissioner Simmons, dissented from the final rules, calling their adoption "one of the most egregious examples of regulatory irresponsibility that I have seen to date." Joint Petition for Rulemaking on Railroad Car Hire Compensation, 9 I.C.C.2d 80, 93 (1992) (Final Rules). Discussing the many changes in course between the second notice and the final rules, the dissent stated: "[The] inexplicable reversals can lead to but one conclusion--that the majority's sole consideration in this decision is to preserve the petitioners' coalition." Id. at 94
 
 
 [3]
 The members of the Association of American Railroads had adopted a Code of Car Hire Rules in order to ease the administrative burdens of abiding by the mandatory interchange requirement and the ICC's prescription formula
 
 
 [4]
 Under 49 U.S.C. Sec. 10706(a)(2)(A) (1995), railroads are required to seek ICC approval of agreements that relate to "rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them or procedures for joint consideration, initiation, publication, or establishment of them." The Commission may not approve any agreement that establishes "a procedure for determination of a matter through joint consideration unless the Commission finds that each party to the agreement has the absolute right under it to take independent action before or after a determination is made under that procedure." 49 U.S.C. Sec. 10706(d)(2)(C) (1995)
 
 
 [5]
 SP proposed the following language be inserted in the Final Rule:
 The Commission may at any time review whether (a) continuation of the application of prescribed rates to fixed rate cars or (b) prescription of rates for market rate cars may need to be revised, modified, or otherwise changed in the public interest, either upon its own motion or upon the petition of any interested party for good cause shown.
 Id. at 6.
 
 
 [6]
 SP suggested as well that the form of arbitration employed is arbitrary because the arbitrator must choose wholly one position or the other and may not examine other arbitral awards or other offers for similar types of cars. This device, whether or not suited to the statute, is designed to maximize the likelihood that issues will be resolved through negotiations--that arbitration will not be used. See National Emergency Disputes--The Considerations Behind a Legislative Proposal, 4 GA.L.REV. 673, 688-90 (1970)
 
 
 [7]
 The dissent mentions SP's participation in earlier rulemakings. Op. at 428. Of course, participation in separate rulemakings cannot make SP a party aggrieved in this proceeding. Simmons, 716 F.2d at 45
 
 
 [1]
 Petitioners St. Louis Southwestern Railway Company and The Denver and Rio Grande Western Railroad Company are subsidiaries of SP. Angelina and Neches River Railroad Company, the original petitioner in No. 94-1550--a challenge to the Commission's decision not to allow the recovery of rebuilding expenses for "excluded boxcars," Joint Petition for Rulemaking on Railroad Car Hire Compensation, 10 I.C.C.2d 181 (1994)--withdrew its petition for review on April 5, 1995, and SP does not seek to raise those issues on appeal
 
 
 [2]
 The court relies on cases establishing the proposition that "a party may not appeal from a disposition in its favor." Showtime Networks Inc. v. FCC, 932 F.2d 1, 4 (D.C.Cir.1991). See Op. at 424. Those cases involved parties who prevailed in adjudications. See Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 176, 54 S.Ct. 658, 668, 78 L.Ed. 1182 (1934); Shell Oil Co. v. FERC, 47 F.3d 1186, 1201-02 (D.C.Cir.1995); Showtime Networks, 932 F.2d at 4; National Ass'n of Cas. & Sur. Agents v. Board of Governors, 856 F.2d 282, 284 n. 1 (D.C.Cir.1988). By contrast, SP challenges the Commission's final rules in their entirety, having lost in its own efforts during the notice-and-comment proceedings to obtain close Commission monitoring and by declaratory order to have the right of independent action
 
 
 [3]
 The court's application of its aggrievement rule is akin to that of the disfavored doctrine of judicial estoppel, which "is used to preclude a party from taking a position that is inconsistent with one successfully asserted by the same party in a prior proceeding." United Mine Workers of Am. 1974 Pension v. Pittston Co., 984 F.2d 469, 477 (D.C.Cir.1993). This court, however, has firmly disapproved of judicial estoppel in prior cases. Id. at 477-78; American Methyl Corp. v. EPA, 749 F.2d 826, 833 n. 44 (D.C.Cir.1984); Konstantinidis v. Chen, 626 F.2d 933, 936-38 (D.C.Cir.1980). Moreover, as noted, SP cannot be said to be "taking a position that is inconsistent with one [it] successfully asserted ... in a prior proceeding."
 The related doctrine of equitable estoppel is equally inapposite in the instant case. The Commission has not established the required elements of "false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance." International Org. of Masters, Mates & Pilots v. Brown, 698 F.2d 536, 551 (D.C.Cir.1983) (quotation marks omitted). And even though estoppel may apply when a party has misled the Commission in an adjudication, see Consolidated Rail Corp. v. ICC, 29 F.3d 706, 714 (D.C.Cir.1994), comments in this rulemaking did not induce detrimental reliance by the Commission. See Natural Resources Defense Council, Inc. v. EPA, 822 F.2d 104, 122 n. 17 (D.C.Cir.1987).
 
 
 [4]
 Although the court is correct that the Commission would not have been allowed to run afoul of the Administrative Procedure Act, Op. at 424, the court does not explain why the APA requires the institution of a separate docket
 
 
 [5]
 The Commission granted early approval of that portion of the industry-group proposal that allowed carriers to enter into bilateral agreements even as to rates higher than the prescribed rates. Joint Petition for Rulemaking on Railroad Car Hire Compensation, 8 I.C.C.2d 222, 224-26 (1991)
 
 
 [6]
 49 U.S.C. Sec. 11122 provides that:
 (a) The regulations of the Interstate Commerce Commission on car service shall encourage the purchase, acquisition, and efficient use of freight cars. The regulations may include--
 (1) the compensation to be paid for the use of a locomotive, freight car, or other vehicle;
 (2) the other terms of any arrangement for the use by a rail carrier of a locomotive, freight car, or other vehicle not owned by the rail carrier using the locomotive, freight car, or other vehicle, whether or not owned by another carrier, shipper, or third person; and
 (3) sanctions for nonobservance.
 (b) The rate of compensation to be paid for each type of freight car shall be determined by the expense of owning and maintaining that type of freight car, including a fair return on its cost giving consideration to current costs of capital, repairs, materials, parts, and labor. In determining the rate of compensation, the Commission shall consider the transportation use of each type of freight car, the national level of ownership of each type of freight car, and other factors that affect the adequacy of the national freight car supply.
 
 
 [7]
 Had the Commission decided that the right of independent action applied, it may have been authorized to grant an exemption to the Code of Car Hire Rules under 49 U.S.C. Sec. 10505, as it did in its Final Decision, 9 I.C.C.2d at 89-90. Under section 10505:
 the Commission shall exempt a ... transaction ... when the Commission finds that the application of a provision of this subtitle [49 U.S.C. Secs. 10101-11917]--
 (1) is not necessary to carry out the transportation policy of [49 U.S.C. Sec. 10101a]; and
 (2) either (A) the transaction ... is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 49 U.S.C. Sec. 10505 (1988). Because the Commission relied on alternative reasoning upon reconsideration, however, Reconsideration, 9 I.C.C.2d at 1101-04, the Commission's exemption authority is not relevant to our review.
 
 
 [8]
 Section 10706 was originally enacted as part of the Reed-Bulwinkle Act, see Act of June 17, 1948, ch. 491, 62 Stat. 472, and was codified at 49 U.S.C. Sec. 5b (1952)
 
 
 [9]
 In past decisions, the Commission has declared that "[w]e cannot emphasize too strongly that the right of a carrier member of a ratemaking bureau to take independent action before or after the collective ratemaking process is absolute under section [10706(d)(2)(A) ]." Rate Bureau Investigation, 351 I.C.C. 437, 459 (1976), aff'd sub nom. Motor Carriers Traffic Ass'n v. United States, 559 F.2d 1251 (4th Cir.1977); see also Rate Bureau Investigation, 349 I.C.C. 811, 819 (1975) ("[T]he right of independent action is essential to the efficient functioning of our transportation system and must in no manner be impaired."), clarified, 351 I.C.C. 437 (1976)
 
 
 [10]
 SP also contends that the arbitration rules are inconsistent with a provision in the ADRA that requires the arbitrator to "apply relevant statutory ... requirements," 5 U.S.C. Sec. 579(c)(5) (1994), because the Commission's rules require arbitrators to apply a standard that differs from that required by Sec. 11122